Harold D. Irizarry López, Nelly Ivette Talavera Rodríguez y la Sociedad Legal de Gananciales compuesta por ambos, recurridos, *v.* Carlos T. García Cámara, Frances Joan Tramal Gutiérrez y la Sociedad Legal de Gananciales compuesta por ambos, peticionarios.

*Número:* CC-2000-564 *Resuelto:* 27 de noviembre de 2001

*Arnaldo J. Irizarry Irizarry*, abogado de la parte peticionaria; *José A. Rubio Pitre*, abogado de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR RIVERA PÉREZ emitió la opinión del Tribunal.

Los aquí peticionarios recurren ante esta Curia, mediante este recurso de *certiorari*, de una sentencia dictada por el Tribunal de Circuito de Apelaciones, la cual confirmó otra emitida por el Tribunal de Primera Instancia. Concluyeron ambos foros que las partes habían acordado, mediante un contrato titulado "opción de compra", que el comprador continuaría pagando la deuda hipotecaria de la propiedad objeto del contrato, pero que esa obligación no eximía al vendedor de la obligación de pago constituida originalmente.

## I

El Dr. Carlos T. García Cámara era dueño, en carácter privativo, de una residencia ubicada en el sector Punta Arenas del Municipio de Cabo Rojo. Para ese tiempo, el referido galeno vivía en un apartamento arrendado en Villa Taína, Boquerón, ubicado en el mismo municipio, y estaba en proceso de construir una nueva residencia.[1] El Lcdo. Harold Irizarry López estaba interesado en comprar una casa de veraneo. Al pasar un día por el sector Punta

---

[1] Apéndice del recurso de *certiorari*, pág. 97.

Arenas vio que la residencia del doctor García Cámara tenía un rótulo de "SE VENDE" y se comunicó con él.([2]) Ambas partes se reunieron e inspeccionaron la residencia, la cual se encontraba alquilada a unos estudiantes de Medicina. Acordaron volverse a reunir para discutir los términos de la compra y venta.([3])

Se reunieron en la oficina del doctor García Cámara ubicada en el Municipio de Cabo Rojo. Allí acordaron que el precio de venta sería ciento cincuenta mil dólares ($150,000) y que se firmaría un contrato de "opción de compraventa". Estipularon, además, que el día de la firma del contrato el licenciado Irizarry López pagaría la suma de cinco mil dólares ($5,000).([4]) El mencionado licenciado solicitó la entrega de una copia de la escritura y una certificación de cargas y gravámenes de la propiedad, ya que dicho inmueble se encontraba gravado por varias hipotecas.([5]) Según el acuerdo, el comprador se obligó a cancelar los gravámenes hipotecarios, y el vendedor se comprometió a pagar los honorarios y aranceles notariales, así como los aranceles registrales que resultasen de tal gestión. *La hipoteca existente a favor de H.F. Mortgage sería asumida o pagada por el comprador, según dicho acuerdo.*([6])

El 1ro de abril de 1993, se firmó el contrato celebrado entre las partes, titulado "opción de compraventa". A dicho acto concurrieron las partes y la corredora de bienes raíces, de apellido Del Toro. En dicha reunión se realizaron diversos cambios al contrato, los cuales incluyeron el aumento del precio de compra y venta a ciento cincuenta y dos mil dólares ($152,000); el reconocimiento de que el pago de los cinco mil dólares ($5,000) de depósito se abonaría al precio

---

([2]) Íd., pág. 98.

([3]) Íd.

([4]) Íd.

([5]) Íd.

([6]) Íd., pág. 99.

de venta, y el establecimiento de un período de treinta (30) días para firmar la escritura pública de compra y venta.[7] Además, el vendedor se obligó a pagar las contribuciones territoriales hasta el día de la firma de la escritura pública sobre compra y venta y el comprador se comprometió a aceptar los términos del contrato de arrendamiento existente sobre la propiedad objeto de la compra y venta.[8]

En la cláusula quinta del contrato se estipuló lo siguiente:

————QUINTO: Los gravámenes hipotecarios al momento de la firma de la Escritura de Compraventa, serán asumidos y/o pagados por LA SEGUNDA PARTE [el Comprador]. Dichos gravámenes hipotecarios serán deducidos del precio de compra y venta.[9]

El comprador estaba gestionando un préstamo para pagar la totalidad de la deuda hipotecaria de la propiedad y el remanente del precio se entregaría al vendedor. A pesar de que el contrato firmado por las partes se tituló "Opción de Compraventa", como explicamos más adelante, sus términos no cumplen con los requisitos para tal tipo de contrato y sí establecen el perfeccionamiento de una compra y venta, cuya escritura pública se otorgaría posterior-h mente.[10]

El comprador desconocía si el préstamo que estaba gestionando sería aprobado antes de la fecha pactada para firmar la escritura pública sobre compra y venta.[11] Por motivo de viajes de las partes y de falta de entrega de

---

[7] Íd.

[8] Íd.

[9] Íd., págs. 28 y 99.

[10] En el referido contrato se describió detalladamente el bien inmueble objeto del contrato, se pactó el precio de venta y otras condiciones del negocio y se estableció el término dentro del cual las partes otorgarían la escritura pública sobre compra y venta. En el documento al que hacemos referencia el aquí peticionario se obligó a vender, y el aquí recurrido se obligó a comprar, el bien inmueble en cuestión. No surge de dicho documento que se le concediera al aquí recurrido la facultad para decidir si compraba o no la propiedad, ni un término de tiempo para ejercerla.

[11] Apéndice de la petición de *certiorari*, pág. 100.

documentos solicitados al vendedor para la tramitación del préstamo, las partes aplazaron el otorgamiento de la escritura de compra y venta hasta el 15 de mayo de 1993.[12] Además, la parte compradora envió por correo certificado la cantidad adicional de cinco mil quinientos dólares ($5,500) como depósito, que unido a lo entregado previamente totalizaba la suma de diez mil quinientos dólares ($10,500).[13]

El comprador le envió, mediante telefax, un proyecto de escritura de compra y venta al vendedor. Éste establecía el precio de venta en ciento veinticinco mil dólares ($125,000), ya que se entregarían veintisiete mil dólares ($27,000) en efectivo. Disponía, además, que el comprador retenía del precio de venta la cantidad de sesenta y siete mil ciento cuarenta y cinco dólares ($67,145) *"para el pago en su día de la hipoteca que grava la propiedad"*.[14] El vendedor le informó al comprador que no estaba de acuerdo con que éste no asumiera formalmente la hipoteca. Surgió un impasse entre las partes y la escritura de compra y venta no se otorgó.[15]

El 13 de mayo de 1993, el comprador presentó una demanda contra el vendedor, alegando incumplimiento de contrato. Reclamó, además, el resarcimiento en concepto de daños y perjuicios. A pesar de la presentación de la demanda, el vendedor le ofreció al comprador una extensión del contrato previamente otorgado. Dicha oferta estaba sujeta a que se otorgara la escritura pública sobre compra y venta en un término de quince (15) días, a partir de la firma de la extensión, y a que H.F. Mortgage lo liberara de la hipoteca existente. Posteriormente, y por no haber sido aceptada esa oferta, dicha parte (el vendedor) presentó una nueva oferta, en la cual proponía que el comprador pagara

---

[12] Íd.

[13] Íd.

[14] Íd., pág. 101.

[15] Íd.

todos los gastos notariales y se le relevara a él de la hipoteca con H.F. Mortgage.[16] Finalmente, el doctor García Cámara le vendió la propiedad a otras personas por el precio de ciento veinte mil dólares ($120,000), según la Escritura Pública sobre compra y venta Núm. 809 otorgada en Mayagüez, Puerto Rico, ante el notario Roberto M. García Rullán.[17]

Celebrado el acto del juicio, el Tribunal de Primera Instancia dictó sentencia el 12 de noviembre de 1999,[18] declarando con lugar la demanda presentada contra el doctor García Cámara y, en consecuencia, lo condenó a pagarle al licenciado Irizarry López la suma de diez mil quinientos dólares ($10,500). Concluyó el Foro de Primera Instancia que la verdadera intención de las partes en el contrato otorgado fue que el licenciado Irizarry López continuara pagando la hipoteca, mientras el doctor García Cámara continuaría obligado con H.F. Mortgage.

Inconforme con dicho dictamen, el doctor García Cámara presentó un recurso de apelación ante el Tribunal de Circuito de Apelaciones el 18 de febrero de 2000. La parte demandante de autos presentó "oposición al recurso de apelación" el 28 de abril de 2000. El foro apelativo intermedio dictó sentencia el 16 de mayo de 2000, copia de cuya notificación se archivó en autos el 23 de mayo del mismo año. La sentencia de dicho tribunal confirmó aquella dictada por el Tribunal de Primera Instancia. Concluyó el Tribunal de Circuito de Apelaciones que de acuerdo con las determinaciones de hechos realizadas por el Foro de Primera Instancia, tal sentencia es correcta en derecho y no procede variar su dictamen, porque la parte apelante no lo puso en posición de intervenir con la apreciación de la prueba.

---

[16] Íd., pág. 102.

[17] Íd., pág. 103.

[18] Se archivó en autos copia de la notificación de la sentencia el 19 de enero de 2000.

Inconforme con dicha determinación, el demandado de autos recurre ante nos, mediante el recurso de *certiorari*, señalando como errores cometidos por el Tribunal de Circuito de Apelaciones los siguientes:

PRIMER ERROR
Erró el [h]onorable Tribunal de Circuito de Apelaciones, Circuito Regional IV de Aguadilla y Mayagüez, Panel I, en lo siguiente:
El [h]onorable Tribunal de Circuito de Apelaciones resolvió nuestra apelación a base de que cuestionamos la apreciación de la prueba y no entró a las cuestiones de estricto derecho planteadas.
SEGUNDO ERROR
Erró el [h]onorable Tribunal de Circuito de Apelaciones al no cumplir con la doctrina en cuanto a la imposición de una compensación por sufrimientos y angustias mentales en un caso de incumplimiento de contrato.[19]

Estando perfeccionado el recurso, procedemos a resolver.

## II

Antes de discutir los errores señalados por el aquí peticionario, debemos determinar la naturaleza del contrato que otorgaron las partes. Es imperativo este esfuerzo ante la realidad de que las partes titularon el contrato como una "opción de compra y venta", pero de su contenido y de las negociaciones de las partes surge que el negocio jurídico que se perfeccionó fue una compra y venta. Es importante tener en cuenta la verdadera naturaleza del contrato entre las partes, porque de ella dependerán las consecuencias jurídicas y, por lo tanto, el resultado de nuestro análisis.

El aquí peticionario sostiene que el contrato suscrito fue de opción de compra y venta. Esa posición fue sostenida por el Tribunal de Primera Instancia y por el Tribunal de Circuito de Apelaciones. Ahora bien, ¿suscribieron las par-

---

[19] Escrito de *certiorari*, pág. 3.

tes un contrato de opción de compra y venta? Entendemos que no. Veamos.

 El contrato de opción de compra no está regulado por el Código Civil, pero hemos reconocido su existencia en esta jurisdicción.[20] Se trata de un contrato consensual, mediante el cual una parte (promitente) le concede a otra parte (optante) el derecho exclusivo a decidir de manera unilateral si comprará determinado bien inmueble que le pertenece al promitente.[21] Esta facultad tendrá que ejercitarse dentro de un período de tiempo definido por las partes, y tanto el promitente como el optante se beneficiarán con el negocio.[22] En realidad se trata de un contrato preparatorio o precontrato encaminado al eventual otorgamiento de un contrato de compra y venta.[23] Sus elementos esenciales son los siguientes: (1) se concede al optante la facultad de decidir unilateralmente si celebrará el contrato principal (la compra y venta) sin ninguna obligación por parte de éste; (2) dicha concesión tiene carácter de exclusividad; (3) se establece un plazo para ejercitar la opción, y (4) no existe otra condición que no sea la voluntad del optante.[24] De los anteriores elementos podemos colegir que, a pesar de ser un contrato consensual, la opción de compra es un contrato unilateral, porque el optante no está obligado a comprar, contrario al caso del promitente que sí está obligado a venderle al primero, si aquél así lo decide.

Analicemos el contrato otorgado por las partes de autos. El primer criterio que aleja el contrato suscrito por las partes de ser uno de opción de compra, es que en éste no se le concedió la facultad exclusiva al aquí recurrido para decidir si quería comprar el bien inmueble en cuestión. Tampoco se estableció un plazo para que esa parte ejercitara su

---

[20] *Rosa Valentín v. Vázquez Lozada*, 103 D.P.R. 796 (1975).

[21] Íd.

[22] Íd.

[23] Íd.

[24] Íd.

facultad. El plazo establecido fue para otorgar y firmar la escritura pública de compra y venta correspondiente. Mediante el pacto suscrito por las partes de autos, peticionario y recurrido, quedaron obligados recíprocamente entre sí. El primero se obligó a vender, y el segundo a comprar, el bien inmueble objeto del contrato. Resulta forzoso concluir que no se otorgó una opción de compra, ya que el contrato otorgado no cumple con los requisitos establecidos por esta Curia para que exista ese tipo de negocio jurídico.

¿Cuál fue, entonces, el negocio jurídico que otorgaron las partes? Entendemos que se otorgó un contrato de compra y venta. Veamos.

■ El Art. 1334 del Código Civil[25] establece que "[p]or el contrato de compra y venta uno de los contratantes se obliga a entregar una cosa determinada y el otro a pagar por ella un precio cierto, en dinero o signo que lo represente". De la misma forma, el Art. 1213 del Código Civil[26] dispone que para que un contrato sea válido se requiere la concurrencia de tres (3) elementos, a saber: consentimiento, objeto y causa. En el contrato que otorgaron las partes de autos concurrieron los elementos necesarios para la existencia de un contrato de compra y venta. No hay duda de que ambas partes consintieron voluntariamente en obligarse. El objeto del contrato, el bien inmueble en cuestión y la causa, el precio de venta ascendente a la suma de ciento cincuenta y dos mil dólares ($152,000).

■ El contrato otorgado por las partes es de compra y venta, ya que por conducto de éste el doctor García Cámara se obligó a entregar una cosa determinada (el bien inmueble) y el licenciado Irizarry López se obligó a pagar la cantidad de ciento cincuenta y dos mil dólares ($152,000) como contraprestación. Se celebró entre las partes un contrato de compra y venta, a tenor con la definición que establece

[25] 31 L.P.R.A. sec. 3741.
[26] 31 L.P.R.A. sec. 3391.

ñuestro Código Civil. No podemos perder de vista que "[los] contrato[s] existe[n] desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio".[27]

En el caso ante nuestra consideración, las partes otorgaron un contrato de compra y venta y establecieron un plazo para poder consumar la formalidad del otorgamiento de la escritura pública correspondiente. Ésto, sin embargo, no afectó la validez del referido contrato. En el caso *Soto v. Rivera*, 144 D.P.R. 500 (1997), nos enfrentamos a una situación similar a la del caso de autos y resolvimos que las partes habían otorgado un contrato de compra y venta, dejando para un momento posterior el cumplimiento de la formalidad del otorgamiento de los documentos públicos correspondientes, los cuales no podían ser suscritos en ese momento. Del texto del contrato objeto de esta controversia surge, al igual que en el caso citado anteriormente, que las partes decidieron vender y comprar recíprocamente, por lo que se perfeccionó el contrato de compra y venta.

## III

En Puerto Rico impera el principio de la libertad de contratación. Así lo dispone el Art. 1207 de nuestro Código Civil,[28] el cual establece lo siguiente:

> Los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público.

En repetidas ocasiones hemos reconocido que la voluntad contractual está limitada solamente por los crite-

---

[27] 31 L.P.R.A. sec. 3371.
[28] 31 L.P.R.A. sec. 3372.

rios establecidos en la disposición estatutaria antes citada.[29]

El Art. 1210 del Código Civil[30] dispone lo siguiente:

> Los contratos se perfeccionan por el mero consentimiento, y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley.

Hemos resuelto que los contratos tienen fuerza de ley entre las partes, las cuales tienen que cumplir con lo acordado siempre y cuando no se viole la ley, la moral ni el orden público, según lo dispone el estatuto antes citado.[31] Sin embargo, algunos contratos requieren un ejercicio de interpretación para poder determinar la naturaleza de la obligación en que incurrieron las partes. Por esa razón, el Código Civil de Puerto Rico establece unas disposiciones para la interpretación de los contratos.[32] La primera regla establece que se debe atender el texto claro de sus cláusulas, cuando reflejan claramente la intención de las partes. A esos efectos, el Art. 1233 del Código Civil[33] dispone lo siguiente:

> *Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas.*

---

[29] *Arthur Young & Co. v. Vega III*, 136 D.P.R. 157 (1994); *Plaza del Rey, Inc. v. Registrador*, 133 D.P.R. 188 (1993); *Casiano, Jr. v. Borintex Mfg. Corp.*, 133 D.P.R. 127 (1993); *G.E. C. & L. v. So. T. & O. Dist.*, 132 D.P.R. 808 (1993); *García v. World Wide Entmt. Co.*, 132 D.P.R. 378 (1992); *Col. Ing. Agrim. P.R. v. A.A.A.*, 131 D.P.R. 735 (1992); *Camacho Arroyo v. E.L.A.*, 131 D.P.R. 718 (1992); *Hidalgo v. Depto. Servicios Sociales*, 129 D.P.R. 605 (1991); *Unisys v. Ramallo Brothers*, 128 D.P.R. 842 (1991); *Flores v. Municipio de Caguas*, 114 D.P.R. 521 (1983).

[30] 31 L.P.R.A. sec. 3375.

[31] *Trinidad v. Chade*, 153 D.P.R. 280 (2001); *Master Concrete Corp. v. Fraya, S.E.*, 152 D.P.R. 616 (2000); *Gen. Accid. Ins. Co. P.R. v. Ramos*, 148 D.P.R. 523 (1999); *Vélez v. Boy Scouts of America*, 145 D.P.R. 528 (1998); *Constructora Bauzá, Inc. v. García López*, 129 D.P.R. 579 (1991).

[32] 31 L.P.R.A. sec. 3471 *et seq.*

[33] 31 L.P.R.A. sec. 3471 *et seq.*

Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésa sobre aquéllas. (Énfasis suplido.)

La disposición estatutaria antes citada ha sido utilizada por esta Curia en la interpretación de contratos, de cuya letra clara surge la voluntad de las partes sin duda alguna.([34]) En *Marcial v. Tomé*, 144 D.P.R. 522 (1997), reconocimos que se debe seguir la letra clara del contrato, cuando ésta refleja inequívocamente la voluntad de las partes. A pesar de lo dispuesto en esta disposición estatutaria, hay ocasiones en las que no es posible determinar la voluntad de los contratantes con la mera lectura literal de las cláusulas contractuales. Por eso, el Código Civil dispone, en su Art. 1234,([35]) que se podrá juzgar la voluntad de los contratantes por sus actos anteriores, coetáneos y posteriores a la perfección de éste. En repetidas ocasiones hemos reconocido la utilidad de tales criterios para interpretar los contratos.([36]) Sin embargo, al momento de interpretar un contrato es preciso presuponer lealtad, corrección y buena fe en su redacción, e interpretarlo de manera tal que lleve a resultados conformes a la relación contractual y que estén de acuerdo con las normas éticas. Dicho en otras palabras, no se puede buscar oscuridad ni tergiversar la interpretación de los contratos para llegar a resultados absurdos o injustos.([37])

■ En el caso *Flores v. Flores Toledo*, 101 D.P.R. 61 (1973), nos negamos a reafirmar la interpretación que el Tribunal de Primera Instancia le impartió a una cláusula de un contrato de arrendamiento, porque ello resultaría en

---

([34]) *Zeta Enterprises, Inc. v. E.L.A.*, 145 D.P.R. 1 (1998).

([35]) 31 L.P.R.A. sec. 3472.

([36]) *Marcial v. Tomé*, 144 D.P.R. 522 (1997); *Unisys v. Ramallo Brothers*, supra; *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64 (1983); *Coop. La Sagrada Familia v. Castillo*, 107 D.P.R. 405 (1978); *Merle v. West Bend Co.*, 97 D.P.R. 403 (1969).

([37]) *Citibank v. Dependable Ins. Co., Inc.*, 121 D.P.R. 503 (1988).

un absurdo. De igual manera, en *Quiñones López v. Manzano Pozas*, 141 D.P.R. 139 (1996), nos negamos a darle una interpretación literal a un contrato de seguros, porque ésta ocasionaría una injusticia y un resultado incorrecto. El propio Código Civil establece, en su Art. 1235,[38] lo siguiente:

> Cualquiera que sea la generalidad de los términos de un contrato, no deberán entenderse comprendidos en él cosas distintas y casos diferentes de aquéllos sobre que los interesados se propusieron contratar.

Además, dispone el Art. 1236 del Código Civil[39] que "[s]i alguna cláusula de los contratos admitiere diversos sentidos, deberá entenderse en el más adecuado para que produzca efecto". Por lo tanto, si bien hay que considerar la intención de las partes para interpretar los contratos, la interpretación tiene que ser cónsona con el principio de la buena fe y no puede conllevar a resultados incorrectos, absurdos e injustos.

## IV

Precisamente la controversia en el caso de autos gira en torno a la interpretación de una de las cláusulas de un contrato de compra y venta. La parte aquí peticionaria le imputa error al Tribunal de Circuito de Apelaciones al aplicar el derecho vigente en la interpretación del contrato. Arguye que ese foro apelativo intermedio no aplicó la doctrina sobre asunción de deudas e interpretó de manera errónea la referida cláusula contractual. Veamos.

El contrato de compra y venta dispone, en su cláusula quinta, que *el comprador asumirá y/o pagará* al momento de la firma de la escritura pública de compra y venta los gravámenes hipotecarios de la propiedad que será vendida.

---

[38] 31 L.P.R.A. sec. 3473.

[39] 31 L.P.R.A. sec. 3474.

De igual manera establece que el comprador retendría del precio de venta la cantidad necesaria para pagar dichos gravámenes.

▮ Evidentemente nos encontramos ante la figura de la asunción de deuda que ha sido reconocida en Puerto Rico.[40] Esta figura jurídica permite la sustitución del deudor original por un tercero en una obligación, quedando liberado el primero de su obligación con respecto al acreedor.[41] No obstante, para que tenga efecto la sustitución es necesario que el acreedor preste su consentimiento, ya que su derecho de crédito puede verse seriamente afectado con ésta.[42] Si no media el consentimiento del acreedor nos enfrentamos a otra figura distinta, la subrogación de un tercero en el lugar del deudor.[43] Mediante la subrogación, no se extingue el vínculo obligacional entre el deudor original y su acreedor, sino que nace un nuevo vínculo entre el deudor y el tercero subrogado.[44] El deudor original le responde al acreedor por cualquier incumplimiento del tercero subrogado.[45]

¿Pactaron las partes una asunción formal de la deuda garantizada por hipoteca? Entendemos que sí. El texto claro de la cláusula quinta del contrato de compra y venta dispone que el comprador asumirá y/o pagará, al momento de la firma de la escritura de compra y venta, la deuda hipotecaria que grava la propiedad. Para eso, retendría la suma necesaria del precio de venta. No se le puede impartir otra interpretación al asunto ante nos que no sea que las partes acordaron liberar al vendedor de cualquier responsabilidad para con el acreedor hipotecario.

---

[40] *Teachers Annuity v. Soc. de Gananciales*, 115 D.P.R. 277 (1984); *Carmen Centrale v. Descartes, Tes.*, 75 D.P.R. 340 (1953).

[41] *Teachers Annuity v. Soc. de Gananciales*, supra.

[42] Íd.

[43] *Teachers Annuity v. Soc. de Gananciales*, supra; *Calo Rivera v. Reyes*, 115 D.P.R. 123 (1984).

[44] *Calo Rivera v. Reyes*, supra.

[45] Íd.

De hecho, la única manera de asumir una deuda es mediando el consentimiento del acreedor. Lo contrario constituye la subrogación de un tercero en lugar del deudor original, subsistiendo el vínculo original entre el deudor y el acreedor.

## V

Aun cuando podemos disponer de este recurso con la aplicación estricta de la norma ya discutida, pasaremos a revisar las determinaciones de hechos que hizo el Tribunal de Primera Instancia.

Es doctrina reconocida en Puerto Rico que los foros apelativos no intervendrán con las determinaciones de hechos realizadas por los Tribunales de Primera Instancia, salvo que se demuestre parcialidad, pasión o prejuicio de parte de ese foro.[46] Hemos establecido que, como regla general, esta Curia no intervendrá con las determinaciones de hechos que realice ese tribunal, sobre todo cuando no se ha presentado una narración estipulada de la prueba.[47] La parte aquí peticionaria no presentó ante el Tribunal de Circuito de Apelaciones ni ante esta Curia una narración estipulada de la prueba. Por esta razón, no intervendremos con las determinaciones de hechos realizadas por el Tribunal de Primera Instancia. Entendemos que éstas concluyen sobre la intención de las partes de que el comprador asumiera formalmente la hipoteca que gravaba la propiedad o, en su defecto, que la pagara en su totalidad al momento de firmar la escritura pública de compra y venta.

Desde la primera conversación entre las partes se pactó que se cancelarían los gravámenes hipotecarios que grava-

---

[46] *Trinidad v. Chade*, supra; *Belk v. Martínez*, 146 D.P.R. 215 (1998); *Benítez Guzmán v. García Merced*, 126 D.P.R. 302 (1990); *Selosse v. Fund. Educ. Ana G. Méndez*, 122 D.P.R. 534 (1988).

[47] *Benítez Guzmán v. García Merced*, supra.

ban la propiedad y que estaban evidenciados por pagarés. De igual manera, surge que el comprador estaba gestionando un préstamo para pagar la totalidad de la deuda y el remanente para entregárselo al vendedor. También surge que el vendedor, aquí peticionario, se encontraba en proceso de construir una residencia, por lo que probablemente necesitaría financiamiento, y estar obligado con H.F. Mortgage le afectaría su capacidad para obtenerlo. No podemos perder de vista que al momento de firmar el contrato de compra y venta las partes le realizaron múltiples cambios para aclarar sus disposiciones. Sin embargo, no medió alteración alguna a la cláusula en cuestión. Resulta de gran importancia el hecho de que el comprador, aquí recurrido, es un abogado de profesión, por lo que conocía o debía conocer las implicaciones de esa cláusula. Si en realidad interesaba pactar una subrogación en el lugar del deudor original, pudo haber solicitado que se aclarara en ese momento, tal y como lo hicieron con las demás cláusulas.

Impartirle la interpretación que le otorgaron los tribunales inferiores a la cláusula en cuestión, no solamente es contraria a derecho, sino que resultaría en un absurdo jurídico y en una injusticia para el aquí peticionario.

## VI

Interpretada la cláusula quinta del contrato de compra y venta, en la forma previamente expuesta, concluimos que el recurrido no tiene causa de acción alguna contra el peticionario. Nos encontramos ante un contrato de compra y venta que genera obligaciones bilaterales, en el cual ambas partes están respectivamente obligadas una para con la otra.[48] El Art. 1077 del Código Civil[49] permite la resolución de las obligaciones bilaterales en caso de in-

---

[48] *Martínez v. Colón Franco, Concepción*, 125 D.P.R. 15 (1989).

[49] 31 L.P.R.A. sec. 3052.

cumplimiento de una de las partes. No obstante, no puede solicitar el cumplimiento específico de una obligación bilateral aquella parte que no ha cumplido con la obligación que le corresponde.[50] Este principio se encuentra, además, de manera implícita, en el Art. 1053 del Código Civil,[51] que establece que en las obligaciones recíprocas ninguna de las partes incurre en mora si la otra no cumple o se allana a cumplir su parte.

Tratándose de un contrato de compra y venta que genera obligaciones bilaterales, el licenciado Irizarry López no tiene causa de acción alguna contra el doctor García Cámara. La controversia nace por motivo del incumplimiento del primero con su obligación de asumir formalmente la deuda hipotecaria o de pagarla en su totalidad. No podemos perder de vista que la buena fe permea todo nuestro esquema jurídico. Por lo tanto, para poder reclamar contra el doctor García Cámara, el licenciado Irizarry López tenía que haber cumplido de buena fe su obligación de acuerdo con lo pactado expresamente en el contrato, lo cual no hizo.

## VII

Por los fundamentos antes expuestos, *procede revocar la sentencia emitida por el Tribunal de Circuito de Apelaciones, así como aquella dictada por el Tribunal de Primera Instancia. En consecuencia, procede declarar no ha lugar la demanda presentada por el aquí recurrido ante el Tribunal de Primera Instancia.*

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Hernández Denton "disiente de la opinión del Tribunal, por entender que en el caso de

---

[50] *Unisys v. Ramallo Brothers,* supra; *Martínez v. Colón Franco, Concepción,* supra.

[51] 31 L.P.R.A. sec. 3017.

autos las partes pactaron la subrogación del comprador en lugar del vendedor con respecto al acreedor hipotecario. Véase *Calo Rivera v. Reyes*, 115 D.P.R. 123 (1984). Contrario a lo que concluye la opinión del Tribunal, las partes no pactaron una asunción de deuda. Por ende, confirmaríamos la sentencia del Tribunal de Primera Instancia". El Juez Asociado Señor Fuster Berlingeri concurrió sin opinión escrita.