Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
Panel X

| | | |
|---|---|---|
| BANCO POPULAR DE PUERTO RICO<br>Recurrido<br><br>v.<br><br>JOSÉ A. VELÁZQUEZ GRAU y OTROS<br>Peticionarios | KLCE202201220 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala de Caguas<br><br>Caso Núm.<br>E CD2013-0312<br><br>Sobre:<br>Cobro de Dinero |

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Adames Soto, la Jueza Mateu Meléndez y el Juez Marrero Guerrero

Adames Soto, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 28 de abril de 2023.

Comparece José Ángel Velázquez Grau, Eilein Ruíz Fernández, y la Sociedad Legal de Gananciales compuesta por ambos (parte peticionaria), a través de recurso de *certiorari,* solicitando que revisemos una *Resolución* emitida por el Tribunal de Primera Instancia, Sala Superior de Caguas, (TPI), el 1 de noviembre de 2022. En el contexto de una acción en cobro de dinero y ejecución de hipoteca iniciado por la institución bancaria de epígrafe, el foro primario declaró Sin Lugar una solicitud de la parte peticionaria para que fueran paralizadas ciertas órdenes de embargo, y se celebrara una vista evidenciaria en la que pudieran impugnarse las cantidades por concepto de presunta deuda en deficiencia que le correspondía pagar.

Por los fundamentos que expondremos a continuación, se expide el recurso y se modifica la determinación impugnada.

## I. Resumen del tracto procesal

El 10 de octubre de 2006, la parte peticionaria suscribió un pagaré a favor del Banco Popular de Puerto Rico (BPPR o parte recurrida), por la suma principal de $160,000.00 (Préstamo #1).[1] Según se dispuso en el referido instrumento financiero, fue acordado que sería pagadero en 239 pagos mensuales consecutivos de $666.67, y un último pago de $666.87, todos más intereses, desde el 10 de noviembre de 2006 en adelante. Entre otras cosas, se acordó que en caso de incumplimiento, la suma principal devengaría un interés fluctuante de 4.500% sobre la tasa de interés primario.

Con el fin de garantizar el pago de la deuda asumida, la peticionaria entregó en prenda el siguiente pagaré:

> Pagaré suscrito por las partes, José Ángel Velázquez Grau y Eileen Giselle Ruiz Hernández t/c/c Eilein Giselle Ruiz Hernández por la suma principal de $160,000.00, con vencimiento a la Presentación, pagadero a la orden del Banco Popular o a su Orden, garantizado por Hipoteca en Garantía de Pagaré mediante Escritura Número 169 de fecha 10 de octubre de 2006, ante el Notario Público Carlos José Mangual Santiago.[2]

Además, el 1 de agosto de 2007, BPPR y la parte peticionaria suscribieron un contrato de préstamo mediante el cual el primero concedió a la segunda la cantidad principal de $70,000.00. El mismo día, la parte peticionaria suscribió un pagaré (Préstamo #2) por la referida suma

---

[1] Pagaré #2557584-9002.

[2] El aludido Pagaré grava la siguiente propiedad:

---URBANA: Solar radicado en la Calle Doctor Rufo esquina a Betances, propiedad del Municipio de Caguas, antes, hoy propiedad de los hermanos Soto, compuesto por Ciento Treinta y Tres punto Sesenta y Ocho Metros Cuadrados (133.68 m/c). En lindes por el NORTE, en dos (2) alineaciones, una de nueve punto cero cero (9.00) metros y la otra de seis punto treinta y dos (6.32) metros, con el solar municipal ocupado por Isaac Newton; por el SUR, en quince punto setenta (15.70) metros con la Calle Betances; por el ESTE, en diez punto cero cero (10.00) metros, con el solar municipal ocupado por Juan Lebrón; y por el OESTE, en dos alineaciones, una de siete punto cincuenta y cinco (7.55) metros con la Calle Doctor Rufo y la otra en tres punto cero cero (3.00) metros con el solar municipal ocupado por Isaac Newton.--------------------------------------------------------------------------------------

---Enclava edificación.-----------------------------------------------------------------------------------

---Inscrita al folio Ciento Cincuenta y Nueve (159) del tomo Trescientos Sesenta y Cinco (365) de Caguas, finca número Nueve Mil Setecientos Cuarenta y Ocho (9,748) del Registro de la Propiedad de Caguas, Sección Primera.----------------------------------------------------------

principal a la orden del BPPR.[3] En este caso se acordó que el préstamo sería pagadero en 180 pagos mensuales consecutivos de $703.32, con sus intereses, comenzando el día 1 de septiembre de 2007. En el convenio se incluyó que el balance insoluto de la suma principal devengaría intereses a razón de una tasa de interés fija de 8.710% anual, y de ocurrir algún incumplimiento, devengaría intereses a razón de una tasa fija de 11.710%. En garantía de la deuda, la parte peticionaria entregó en prenda el pagaré en cuestión, según el cual:

> Pagaré suscrito por las partes codemandadas, José Ángel Velázquez Grau y Eilein Giselle Ruiz Fernández, por la suma principal de $70,000.00, con vencimiento A LA PRESENTACIÓN, pagadero a la orden del Banco Popular o a su Orden, garantizado mediante Escritura de Hipoteca Número 55 con fecha de 1 de agosto de 2007, ante el Notario Rafael J. Velázquez Villares.[4]

Posteriormente, el 11 de abril de 2011, la parte peticionaria suscribió un tercer pagaré a la orden del BPPR, por la suma principal de $25,000.00 (Préstamo #3).[5] En este caso, el préstamo sería pagadero en 84 pagos mensuales consecutivos de $207.62, desde el 11 de mayo de 2011. Asimismo, fue convenido que el balance insoluto de la suma principal devengaría intereses a razón de una tasa de interés fluctuante de 4% anual sobre la tasa de interés primaria, y de ocurrir algún incumplimiento

---

[3] Pagaré #2557584-9003.
[4] El Pagaré grava la siguiente propiedad:
> ---URBANA: PROPIEDAD HORIZONTAL: Unidad residencial marcado con el número ciento uno (101) del bloque (Cluster) "A" del Edificio C (Sol) del Régimen de Propiedad Horizontal conocido como Condominio Bosque del Mar sito en el Barrio Zarzal del Municipio de Río Grande, Puerto Rico. Consta de planta con un área aproximada de construcción de MIL DOSCIENTOS NUEVE PUNTO SETENTA Y TRES (1,209.73) PIES CUADRADOS, equivalentes a CIENTO DOCE PUNTO TREINTA Y NUEVE (112.39) METROS CUADRADOS, colinda por el NORTE, con áreas comunes por el SUR, con área de estacionamiento, por el ESTE, con áreas de estacionamiento, por el ESTE, con áreas de entrada y pasillo del bloque A y por el OESTE, con áreas comunes. Esta unidad es el modelo F. Su entrada es al lado Este en el primer piso del edificio que da al área de la sala, comedor que a su vez da al balcón en el lado Norte y a una cocina en el lado Sur. Consta de dos (2) dormitorios con clóset, uno de ellos máster con baño y balcón, dos clósets en el área del pasillo, uno de ellos para laundry y un baño en el pasillo que conecta a los dormitorios. Tiene los estacionamientos número uno (1) y número dos (2). Tiene una participación de cero punto seis mil setecientos setenta y cuatro por ciento (0.6774%).---------------------------------
> ---Consta inscrita en el Registro de la Propiedad de Carolina, Sección Tercera al folio 158 del tomo 486 de Río Grande, finca número 26, 435, inscripción primera.------------------------

[5] Pagaré #2557584-9004.

devengaría intereses a razón de una tasa de interés fluctuante de 7%, sobre la tasa de interés primario.

No obstante, luego de que presuntamente el BPPR llevara a cabo varios alegados intentos infructuosos de cobro al peticionario, el 6 de marzo de 2013, el primero instó la reclamación judicial que dio inicio al asunto ante nuestra consideración. Como resultado, tal acción fue anotada preventivamente en la sección correspondiente del Registro de la Propiedad del inmueble antes descrito, cuya ejecución se solicita en la presente.

Todo por lo cual, BPPR solicitó al TPI que dictara sentencia a su favor condenando a la parte peticionaria a satisfacerle solidariamente: del **Préstamo #1**: un balance principal de $118,868.34, más intereses al 22 de febrero de 2013 de $4,405.04, más $321.71 de una cuenta plica *escrow*, más $25.58 de intereses devengados diariamente desde el 23 de febrero de 2013; del **Préstamo #2**, un balance principal de $56,690.13, más intereses desde al 22 de febrero de 2013 de $2,727.48, más $16.14 de intereses devengados diariamente desde el 23 de febrero de 2013; del **Préstamo #3**, un balance del principal de $20,238.08, más intereses al 22 de febrero de 2013 de $945.01, más $5.75 de intereses devengados diariamente desde el 23 de febrero de 2013, más las costas, gastos y desembolsos de litigio, al igual que el 10% en honorarios de abogados correspondientes a los pagarés, según pactados. En defecto del pago, dicho banco solicitó que se ordenara la ejecución de la garantía hipotecaria, y consiguiente venta en pública subasta del bien inmueble hipotecado, para la aplicación del importe a la antedicha deuda.

En respuesta, el 13 de mayo de 2013, la parte peticionaria presentó *Contestación a Demanda y Reconvención.*

Luego de varios trámites procesales, no necesarios resaltar, el 27 de diciembre de 2013, las partes presentaron en conjunto un *Acuerdo de Sentencia por Estipulación,* acordando un plan de pago, que fue acogido por el TPI y el 7 de enero de 2014, emitiéndose la correspondiente *Sentencia por Estipulación.* En la cláusula veinte de dicha estipulación las partes

acordaron que, en caso de que el peticionario dejara de satisfacer el pago acordado, "ello constituiría incumplimiento con los términos del presente acuerdo y será razón suficiente para que el Banco Popular proceda, sin notificación alguna a los codemendados [...] a ejecutar el bien inmueble antes descrito y proceder a la venta en pública subasta del inmueble hipotecado".[6]

Sin embargo, el BPPR adujo nuevamente incumplimiento de los términos del referido Acuerdo, por lo que, luego de varias incidencias procesales, —incluyendo la presentación de una solicitud de quiebra por la parte peticionaria, que resultó desestimada—, se continuó el proceso de ejecución de hipoteca, expidiéndose el Aviso de Pública Subasta, a tenor con la Sentencia dictada por el foro recurrido, el 7 de enero de 2014. Conforme a lo cual, se pautó la celebración de la primera subasta para el 30 de enero de 2019.

En efecto, la primera subasta se llevó a cabo en la fecha propuesta, pero fue declarada desierta. En desacuerdo con el proceso hasta allí realizado, el 1 de febrero de 2019, la parte peticionaria presentó una *Solicitud Urgente de Paralización de Subasta y Celebración de Vista Evidenciaria para Informar las Negociaciones Realizadas por los Codemandados con el Demandante en la División de Préstamos Especiales del Banco Popular de Puerto Rico.*

No obstante, el 6 de febrero de 2019, se celebró la segunda subasta pública, la cual, del mismo modo, fue declarada desierta.

El 11 de febrero de 2019, el BPPR se opuso a la solicitud de paralización del proceso de subasta instada por el peticionario, mediante moción.

Al próximo día, el 12 de febrero de 2019, el TPI emitió *Orden* declarando No Ha Lugar la solicitud de paralización de subasta sometida por la parte peticionaria.

---

[6] Véase, Apéndice de *Certiorari,* pág. 17.

A raíz de ello, el 19 de febrero de 2019, la parte peticionaria presentó una *Moción Urgentísima en Oposición y Objeción a Venta Judicial y Reiterando Vista Evidenciaria Postsentencia y en Solicitud de Evidencia de Pagaré y Certificación Registral*. En esta, reiteró su solicitud de atención judicial a las presuntas irregularidades y ausencia del valor jurídico en el proceso seguido postsentencia. Con referencia a las aducidas irregularidades, sostuvo que, el 18 de febrero de 2019, recibió mediante correo electrónico, notificación de los siguientes cuatro escritos presentados por el BPPR: (1) *Moción solicitando desalojo y lanzamiento*; (2) *Moción Solicitud de Confirmación de Venta Judicial*; (3) *Moción sobre cancelación de Gravámenes Posteriores*, y; (4) *Moción Urgente en Oposición a "Moción Urgente en Solicitud de Reconsideración a Orden Declarando No Ha Lugar la Paralización de Subasta y Reiterando Solicitud de Celebración de Vista Evidenciaria*. Indicó, coetáneamente, que dichos escritos fueron presentados al TPI el 13 de febrero de 2019, fecha en que se celebró la tercera subasta en la cual se le adjudicó la buena pro al BPPR.

En aras de prevenir la confirmación de la venta judicial, la parte peticionaria presentó *Moción Informativa Urgentísima*, reiterando la importancia de que el TPI tomara acción sobre las mociones ante su atención. El 12 de marzo de 2019, notificada al próximo día, el TPI declaró No Ha Lugar la referida solicitud.

Inconforme, el 11 de abril de 2019, la parte peticionaria compareció ante este Tribunal mediante recurso de *Certiorari*, identificado con el alfanumérico KLCE2019-0497. Como resultado, un panel hermano revocó la Orden del TPI de 12 de marzo de 2019, y devolvió el caso para que se celebrara la vista evidenciara solicitada por la parte peticionaria. Del mismo modo, dejó sin efecto una Orden de Lanzamiento de 19 de febrero de 2019.

Celebrada la vista probatoria ordenada, el 28 de mayo de 2021, el BPPR presentó ante el foro primario una *Moción Solicitando Ejecución de Sentencia y Embargo*, con el propósito de recobrar la suma de $170,560.17, alegadamente adeudada por la parte peticionaria, en concepto de

deficiencias originadas en la ejecución de la garantía hipotecaria del inmueble dado en prenda.

Luego, el 22 de junio de 2022, el TPI emitió Orden expidiendo la orden de embargo de bienes para el cobro de la aludida deuda.

En atención a ello, la parte peticionaria sometió una *Urgente Moción en Solicitud de Reconsideración; Reiterando Solicitud de Vista Evidenciaria y el Solicitud de Paralización de Órdenes de Embargo.* En esta, reiteró la alegada necesidad de celebrar una vista urgente para dirimir la procedencia del cobro, la ausencia de deuda vencida, líquida y exigible, y la alegada mala fe desplegada por el BPPR.[7]

Sin embargo, el TPI emitió Resolución declarando Sin Lugar la moción de reconsideración de la peticionaria, el 1 de noviembre de 2022.

Es así como, inconforme con dicha denegatoria judicial, la parte peticionaria recurre nuevamente ante nosotros, señalando los siguientes errores que, aduce, cometió el foro recurrido:

1. ERRÓ EL HONORALE TRIBUNAL DE PRIMERA INSTANCIA, COMETIÓ ERROR MANIFIESTO EN DERECHO, Y ABUSÓ DE SU DISCRECIÓN AL DETERMINAR QUE LA VENTA EN PÚBLICA SUBASTA NO EXTINGUIÓ LA CUANTÍA DISPUESTA EN LA SENTENCIA Y PROVOCAR LA SUBSISTENCIA DE UNA DEUDA ARTIFICIAL E INEXISTENTE.

2. ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA Y COMETIÓ ERROR MANIFIESTO EN DERECHO AL CALIFICAR COMO PROCEDENTE [EL] COBRO DE UNA DEFICIENCIA INEXISTENTE; QUE NO CORRESPONDE A UNA DEUDA LÍQUIDA NI EXIGIBLE; Y QUE CONFORMA UNA INSTACIA DE ENRIQUECIMIENTO INJUSTO.

Junto al recurso de certiorari la parte peticionaria acompañó una *Moción Urgentísima en Auxilio de Jurisdicción,* que declaramos No Ha Lugar, pero concedimos un término de diez días al BPPR para que expusiera su postura.

El BPPR compareció mediante *Memorando en Oposición a Expedición del Auto.* Contando con el beneficio de la comparecencia de las partes, estamos en posición de resolver.

---

[7] Véase Apéndice de *Certiorari*, págs. 392-421.

## II. Exposición de Derecho

### A. Los Contratos

El Art. 1206 de nuestro Código Civil dispone que, "[e]l contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio." 31 LPRA § 3371. Allí se añade que "[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes." Art. 1044 del Código, 31 LPRA § 2994. Además, "[l]os contratos se perfeccionan por el mero consentimiento, y desde entonces obligan, no solo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley." Art. 1210 del Código Civil, 31 LPRA § 3375.

En nuestra jurisdicción rige el principio de la autonomía de la voluntad, por lo que se le reconoce amplia libertad de acción a las partes que desean obligarse de manera contractual. *BPPR v. Sucn. Talavera*, 174 DPR 686, 693 (2008). De conformidad, el Art. 1207 del Código Civil dispone que "[l]os contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público". 31 LPRA § 3372; *Álvarez de Choudens v. Rivera Vázquez*, 165 DPR 1, 17 (2005); *Irizarry López v. García Cámara*, 155 DPR 713, 724 (2001).

Tales normas reconocen un doble postulado en la teoría general de la contratación, de un lado la libertad de contratación, de otro, la total autonomía de la voluntad de los contratantes que han escogido obligarse mutuamente para determinar el contenido de dicha relación jurídica, limitada únicamente por los parámetros que impongan la ley, la moral social y el orden público. Una vez los contratantes eligen contratar entre sí, pueden pautar el contenido y alcance normativo de su relación jurídica, sin otra intromisión del Estado que la impuesta por los parámetros descritos. Por lo tanto, los tribunales de justicia no pueden relevar a una parte de

cumplir con lo que se obligó a hacer mediante un contrato, cuando el mismo es legal y válido. *De Jesús González v. A.C.*, 148 DPR 255, 271 (1999). *Olazábal v. U.S. Fidelity, etc.*, 103 DPR 448, 462 (1975).

### C. Interpretación de los Contratos

Nuestro Tribunal Supremo ha reiterado que los contratos no están sujetos a interpretación cuando sus términos son claros y específicos, labor que ha de hacerse de manera integral y no aisladamente, de manera que se busque su verdadero sentido, atendiendo a la interpretación de unas cláusulas con relación a otras. *Asoc. Res. Los Versalles v. Los Versailles*, 194 DPR 258, 267 (2015). "Si los términos de un contrato son claros y no dejan dudas sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas." Art. 1233 del Código Civil, 31 LPRA § 3471. Los términos de un contrato son claros cuando son suficientes en contenido para ser entendidos en un único sentido, sin dar lugar a dudas o controversias, sin diversidad de interpretaciones y sin necesitar, para su comprensión, razonamientos o demostraciones susceptibles de impugnación. *Corp. del FSE v. Unión de Médicos*, 170 DPR 443, 450 (2007) citando a *Sucn. Ramírez v. Tribl. Superior*, 81 DPR 357 (1959).

Ahora bien, cuando no podemos depender del sentido literal de las palabras, debemos recurrir a la intención de las partes al momento de contratar, "la intención evidente de las partes prevalecerá sobre las palabras, aun cuando éstas parecieran contrarias a aquéllas." *Asoc. Res. Los Versalles v. Los Versailles*, supra; Art. 1233 del Código Civil, *supra*. Para analizar la intención de las partes, se deberá considerar los actos anteriores, coetáneos y posteriores al contrato. Artículo 1234 del Código Civil, supra. Por lo tanto, si bien es cierto que hay que considerar la intención de las partes para interpretar los contratos, dicha interpretación tiene que ser cónsona con el principio de buena fe y no puede llevar a resultados incorrectos, absurdos e injustos. *S.L.G. Irizarry v. S.L.G. García*, 155 DPR 713, 727 (2001).

Por otra parte, el Código Civil dispone que "cualquiera que sea la generalidad de los términos de un contrato, no deberán entenderse comprendidos en él cosas distintas y casos diferentes de aquéllos sobre los que los interesados se propusieron contratar". Art. 1235 del Código Civil, 31 LPRA sec. 3473. Además, el Art. 1236 del Código Civil dispone que cuando alguna cláusula del contrato admita diversos sentidos, deberá entenderse al más adecuado para que produzca el efecto. 31 LPRA sec. 3474. En ese sentido, el Tribunal Supremo ha reiterado que el efecto más adecuado se refiere a la eficacia de la función económica del contrato y la finalidad que trata de alcanzar. *BPPR v. Sunc. Talavera*, 174 DPR 686, 708 (2008). Por lo que, cuando una disposición contractual no está reñida con la ley, la moral o el orden público, se le debe dar aplicación integral a lo convenido. *Corp. Del FSE v. Unión de Médicos*, supra, pág. 451.

## D. La Novación

En nuestra jurisdicción existen dos tipos de novación, a saber: (1) la extintiva, mediante la cual se extingue una obligación que existía antes; y (2) la modificativa, que sólo apareja la variación de alguna condición de una obligación que subsiste en cuanto a sus otros términos. *López v. Atlantic Southern Ins. Co.*, 158 DPR 562 (2003); *Miranda Soto v. Mena Eró*, 109 DPR 473, 478-479 (1980); *Warner Lambert Co. v. Tribunal Superior*, 101 DPR 378, 389 (1973). La novación tiene lugar cuando se introducen cambios o modificaciones a la relación obligatoria, bien en cuanto a la naturaleza o contenido de la misma (novación objetiva) o en cualquiera de los sujetos (novación subjetiva). O. Soler Bonnin, *Obligaciones y Contratos: Manual para el estudio de la teoría general de las obligaciones y del contrato en el derecho civil puertorriqueño*, San Juan, Ed. Situm, 2014, pág. 95. Indistintamente de si el cambio es objetivo o subjetivo, la novación puede producir la extinción de una obligación mediante la creación de una nueva destinada a reemplazarla (novación extintiva), o la simple modificación de una obligación, quedando vigente la relación obligatoria pero modificada (novación modificativa). *Íd.* En otras palabras, mediante

la novación extintiva se extingue una obligación preexistente y simultáneamente nace una nueva obligación que sustituye a la original, mientras que la modificativa se limita a modificar alguna condición de la obligación preexistente, en cuyo caso subsiste la obligación original alterada.

Sobre el mismo asunto, el Art. 1110 del Código Civil, 31 LPRA sec. 3151, dispone que la novación es una de las causas de extinción de las obligaciones. "Para que una obligación quede extinguida por otra que la sustituya, es preciso que así se declare terminantemente, o que la antigua y la nueva sean de todo punto incompatibles". Art. 1158 del Código Civil, 31 LPRA sec. 3242. En lo pertinente, el Tribunal Supremo, ha señalado que la novación "consiste en la sustitución de una relación obligatoria por otra, destinada a extinguir aquélla". *Mun. de San Juan v. Prof. Research*, 171 DPR 219, 243-244 (2007). Así pues, la novación extintiva "[e]s un acto jurídico de doble función que, a la vez que extingue, hace nacer en lugar de ella otra obligación nueva". *Íd.,* a la pág. 244. No obstante, como ya dijimos, la novación puede ser de naturaleza extintiva o modificativa. *Íd.* "Las partes pueden extinguir una obligación sustituyéndola completamente por otra o pueden limitarse a modificarla". *Miranda Soto v. Mena Eró, supra*, a la pág. 479. Las obligaciones pueden modificarse de varias formas, a saber: "(1) variando su objeto o sus condiciones principales; (2) sustituyendo la persona del deudor, [o] (3) subrogando a un tercero en los derechos del acreedor". Art. 1157 del Código Civil, 31 LPRA sec. 3241; *Constructora Bauzá, Inc. v. García López*, 129 DPR 579, 598 (1991).

En el caso de la novación extintiva es un elemento imprescindible que la obligación original desaparezca. *United v. Villa*, 161 DPR 609, 618 (2004). La incompatibilidad entre las obligaciones existe cuando la obligación anterior y la posterior al acto novativo pertenecen a tipos distintos o se han transformado de naturaleza. *Constructora Bauzá, Inc. V. García López, supra,* a la pág. 599. Es decir, la novación extintiva consiste en alteraciones esenciales en la obligación, ya que se varían sus

condiciones principales. *Íd.* En cambio, en la novación modificativa "se mantiene el régimen normativo que regía la obligación original, solo que ahora la obligación ha sido renovada". *United v. Villa, supra,* a la pág. 619. Por tanto, debe existir compatibilidad entre la obligación original y la nueva. *P.D.C.M. Assoc. v. Najul Bez,* 174 DPR 716, 725 (2008).

Para la constitución de una novación modificativa, no es necesario encontrar la voluntad expresa de extinguir una obligación por otra. Empero, es imprescindible hallar un ánimo de cambio. De esta forma, al determinar si nos encontramos ante un supuesto de novación modificativa, es necesario interpretar la voluntad de las partes. Ello, debido a que la novación encierra un asunto de intención que debemos inferir de las circunstancias de cada caso y de la voluntad de las partes. (Énfasis nuestro). *Íd.*, a la pág. 726.

### E. Demanda en Cobro de Dinero

El ordenamiento jurídico que aplica establece que la parte que entabla una acción de cobro de dinero tiene que probar: (1) que existe una deuda válida; (2) que esta no se ha pagado; (3) que él es el acreedor; y (4) que los demandados son sus deudores. *General Electric v. Concessionaires, Inc.,* 118 DPR 32, 43 (1986). Al probarse que, en efecto, existe una obligación de pago, la prueba de la extinción de una obligación le corresponde a la parte que se opone. 31 LPRA sec. 3261.

Además, nuestro Tribunal Supremo estableció que cuando se presenta una demanda por cobro de dinero, se debe alegar que la deuda reclamada es una líquida, vencida y exigible. *Ramos de Szendrey v. Colón Figueroa,* 153 DPR 534, 546 (2001). **Una deuda es líquida cuando la cuantía de dinero debida es cierta y determinada.** Id. La deuda se considera exigible cuando la obligación no está sujeta a ninguna causa de nulidad y puede demandarse su cumplimiento. *Guadalupe v. Rodríguez,* 70 DPR 958, 966 (1950).

Por su parte, el Tribunal Supremo ha establecido que cuando se suscita una controversia en cuanto a si la deuda es líquida y exigible o no,

"las sumas reclamadas **tienen que probarse**; en todo caso, la cuantía [...] debe ser objeto de prueba. Por lo tanto, el tribunal debe celebrar las vistas que sean necesarias y adecuadas para tomar una determinación al respecto". (Énfasis nuestro). *Vizcarrondo Morales v. MVM, Inc.*, 174 DPR 921, 937 (2008). Véase también, *Ruiz v. Col. San Agustín*, 152 D.P.R. 226 (2000); *Rodríguez v. Syntex P.R., Inc.*, 148 D.P.R. 604 (1999); *Hernández v. Espinosa*, 145 D.P.R. 248 (1998); *Vélez v. Boy Scouts of America*, 145 D.P.R. 528 (1998).

Guarda estrecha relación lo dicho con las expresiones del Tribunal Supremo en términos de que es un arraigado principio en nuestro ordenamiento jurídico, y forma parte esencial e intrínseca del debido proceso de ley, garantizarle a toda persona, cuyos intereses estén en controversia, la oportunidad de ser oída y de defenderse, esto es, de tener su "día en corte". *Marrero et al. v. Vázquez et al.*, 135 DPR 174, 189 (1994). [Sentencia]. Este derecho a ser oído ostenta tal transcendencia que, "la privación de un litigante de 'su día en corte' es una medida procedente solo en casos extremos y que debe usarse solamente en casos claros". *Rosario v. Nationwide Mutual*, 158 DPR 775, 780 (2003). Nuestro ordenamiento jurídico favorece que los casos se ventilen en sus méritos. Esto, con el fin de garantizar los derechos de las partes y evitar una privación ilegal de presentar sus reclamos y ser escuchados. *Banco Popular v. S.L.G. Negrón*, 164 DPR 855, 874 (2005).

### F. Remedios provisionales

Las Reglas de Procedimiento Civil reconocen el embargo como uno de los remedios provisionales que puede dictar un tribunal para asegurar la efectividad de una sentencia. Reglas 56.2 a 56.4 de Procedimiento Civil, 32 LPRA Ap. III. R. 56.2 *et seq.* Cual sea el remedio provisional, este puede ser concedido en todo pleito civil, antes o después de dictarse la sentencia, mediante solicitud de parte interesada.

El Tribunal Supremo ha establecido que, como regla general, en todo caso en que se solicite algún remedio provisional como lo es un embargo– y

antes de que el tribunal haga una determinación al respecto–es indispensable que la parte adversa sea notificada y que una vista sea celebrada. Ahora bien, como excepción a esa regla, es permisible que un tribunal expida una orden de embargo ex parte–esto es, sin notificación a la parte adversa y vista previa– siempre que el reclamante preste una fianza para responder por todos los daños y perjuicios que se puedan causar como consecuencia del aseguramiento. *Ramos y Otros v. Colón y Otros*, 153 DPR 534, 542-543 (2001). No obstante, la aplicación de esta excepción sólo tendrá lugar bajo tres supuestos: (1) cuando el reclamante ha alegado o demostrado tener un previo interés propietario sobre la cosa embargada; (2) cuando se han alegado o demostrado la existencia de circunstancias extraordinarias, o (3) cuando se ha alegado o demostrado la probabilidad de prevalecer mediante "prueba documental fehaciente" de la cual se desprenda que la deuda es una líquida, vencida y exigible. *Rivera Rodríguez & Co. v. Lee Stowell, etc.*, 133 DPR 881, 899-900 (1993). "Únicamente en estas situaciones es que un tribunal podrá posponer la celebración de dicha vista hasta *después* de trabado el embargo." (Énfasis en el original suprimido y énfasis suplido.) *Íd.*, pág. 900.

### III. Aplicación del Derecho a los hechos

a.

La discusión incluida en el recurso de *certiorari* sobre el primer señalamiento de error puede resumirse en el siguiente argumento; que por virtud del inciso veinte del *Acuerdo de Sentencia por Estipulación,* el incumplimiento por el deudor-peticionario de las obligaciones allí contraídas solo podía dar lugar a la venta de la propiedad inmueble dada como garantía, y el total de la deuda se cubriría con el importe de dicha venta. Es decir, que aplicaría aquí la figura de la dación en pago, limitando la responsabilidad patrimonial a la propiedad subastada.

Sin embargo, considerada la totalidad de las cláusulas contenidas en dicho *Acuerdo*, resulta evidente que su cláusula veinticinco da al traste con la teoría de la parte peticionaria, en tanto dispone lo siguiente:

25. Los codemandados, José Ángel Velázquez Grau, Eileen Giselle Ruíz Fernández t/c/c Eilein Gisell Ruíz Fernández y la Sociedad Legal de Gananciales Por Ellos Compuesta**, reconocen que los términos del presente acuerdo <u>no</u> constituyen una novación extintiva de las obligaciones contraídas hacia el Banco Popular**.

(Énfasis y subrayado provistos).

De lo anterior se sigue que, por disposición expresa de las partes, fue excluida la aplicación de la figura de la novación extintiva al *Acuerdo,* por lo que se ha de entender que las condiciones de pago contenidas en la obligación inicial u original, no fueron extinguidas. Tal como señalamos en la exposición de derecho, para que acontezca la novación extintiva, la intención de las partes debe ser expresa, o en su defecto, las obligaciones deben ser incompatibles entre sí. No apreciamos que acontezcan ninguno de tales factores y, en consecuencia, no cabe reconocer efecto extintivo en el *Acuerdo*. Por ello, se ha de entender que subsisten los distintos medios de pago de la obligación contraía por el deudor-peticionario, que no están limitados al cobro de la acreencia al solo producto de la venta en pública subasta de la propiedad ejecutada. Este primer error no fue cometido.

b.

En su segundo señalamiento de error, la parte peticionaria arguye que incidió el TPI al dar lugar al cobro de una presunta deficiencia inexistente; que no corresponde a una deuda líquida ni exigible; y que conforma una instancia de enriquecimiento injusto.

En el contexto de una acción de pago de deuda y ejecución de hipoteca no cabe duda de que, del deudor haber incumplido su obligación, el acreedor tiene derecho a obtener la totalidad de su acreencia no satisfecha con la venta de la propiedad hipotecada, persiguiendo los bienes del primero hasta lograr la extinción de la deuda. De aquí que en este caso se hubiese reconocido que, vendido el inmueble objeto de la hipoteca, y no habiéndose obtenido con su precio la totalidad de la cantidad adeudada, resultara una deficiencia a ser satisfecha por el deudor-peticionario.

No obstante, aun partiendo de lo anterior como un hecho, la parte peticionaria plantea que no corresponde conceder la suma que compone la presunta deficiencia, pues aún no es líquida ni exigible, por cuanto realizó una serie de pagos o abonos a la deuda en fechas posteriores a la estipulación, no computados en la deficiencia a ser pagada, o no precisados en la cantidad final que tendría que asumir.

Ya hemos subrayado en la exposición de derecho que, en una acción de cobro de dinero el promovente de la acción tiene que probar que la deuda vencida es líquida y exigible. *General Electric v. Concessionaires, Inc.*, supra. La acepción jurídica del concepto *líquida* es el saldo o residuo de **cuantía cierta**, y la voz *exigible* refiera a que puede demandarse su cumplimiento. (Énfasis provisto). *Guadalupe v. Rodríguez*, supra. La deuda es líquida cuando la cuantía de dinero debida es ***cierta y determinada***. *Ramos y otros v. Colón y otros*, 153 DPR 534, 546 (2001). (Énfasis provisto). Por tanto, cuando se suscite una controversia sobre si la deuda es líquida, es decir, cierta y determinada, el asunto debe ser objeto de prueba, lo que resulta en que el foro primario celebre las vistas necesarias a esos efectos.

Ciertamente, al considerar la argumentación del peticionario, con relación a los pagos que presuntamente realizó a la deuda y no fueron computados para fines de determinar la deficiencia que se le imputa, surge una controversia relativa a si puede considerarse líquida la cuantía de dinero reclamada. Es de ver que en su escrito en oposición a recurso de *certiorari* el BPPR dedicó buena parte de su argumentación al primero de los errores señalados, (con cuya argumentación coincidimos), pero resultó parco en la consideración de este segundo error. Es decir, el recurrido no alzó argumentos relativos a por qué deberíamos considerar que, a diferencia de lo afirmado por la parte peticionaria, la deficiencia a ser pagada por el peticionario en efecto es cierta y determinada.

Por tanto, juzgamos que una determinación final sobre el pago que en concepto de deficiencia deba asumir la parte peticionaria en este caso, requiere precisión sobre la cantidad a pagar, por lo que resulta inevitable la

celebración de una vista para que se permita el desfile de prueba a esos solos fines. Es decir, ante la indeterminación del pago final correspondiente, solo la vía de la vista evidenciaria servirá para precisar la cantidad adeudada. *Vizcarrondo Morales v. MVM, Inc.*, supra.

## IV. Parte dispositiva

Por los fundamentos esbozados, expedimos el auto de *Certiorari* y modificamos la determinación recurrida, a los solos fines de ordenar la celebración de una vista evidenciaria con el propósito de que determine el monto de la deficiencia a ser pagada por la parte peticionaria. De este modo, devolvemos el caso al foro primario para la continuación de los procedimientos, según aquí previstos.

Lo pronunció y manda el Tribunal y lo certifica su Secretaria.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones