Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL X

| CARIBE FEDERAL CREDIT UNION<br><br>Apelado<br><br>v.<br><br>FIRST SECURITY MORTGAGE, INC., CARLOS MANUEL VÉLEZ CRUZ, MARIA DE LOS ÁNGELES GÓMEZ MARCOS, AGUSTÍN MÚJICA NAZARIO, MARÍA DE LOS ÁNGELES GONZÁLEZ MULERO, ASEGURADORA A, B, C Y D, LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR CARLOS M. VÉLEZ CRUZ CON MARÍA DE LOS ÁNGELES GÓMEZ MARCOS Y LA SOCIEDAD LEGAL DE GANANCIALES COMPUESTA POR MARÍA DE LOS ÁNGELES GONZÁLEZ MULERO COMPUESTA CON AGUSTIN MÚJICA NAZARIO<br><br>Apelantes | TA2025AP00407 | *Apelación*<br>Procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.:<br>SJ2022CV11242<br><br>Sobre:<br>Cobro de Dinero-Ordinario |

Panel integrado por su presidenta la Jueza Grana Martínez, el Juez Ronda Del Toro, la Jueza Lotti Rodríguez.

*Grana Martínez, jueza ponente*

**SENTENCIA**

En San Juan, Puerto Rico, a 12 de marzo de 2026.

Agustín Mújica Nazario; María De Los Ángeles González Mulero y la Sociedad Legal de Gananciales compuesta por ambos (en adelante, los Mújica-González o apelantes) mediante recurso de *Apelación* presentado el 4 de octubre de 2025, nos solicita que dejemos sin efecto la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala de San Juan (TPI o foro primario) el 4 de septiembre

de 2025. Mediante el referido dictamen, el foro primario declaró "Ha Lugar" la *Solicitud de Sentencia Sumaria* presentada por Caribe Federal Credit Union (en adelante, Caribe Federal o apelado).

## I.

El 28 de diciembre de 2022, Caribe Federal presentó una *Demanda* de cobro de dinero en contra de Carlos M. Vélez Cruz, su esposa María A. Gómez Marcos, así como Agustín Mújica Nazario y su esposa María de los A. González Mulero, y First Security Mortgage, Inc. (en conjunto, codemandados).[1] Allí, alegó que el 15 de febrero de 2013 otorgó a First Security Mortgage una línea de crédito rotativo (revolving) por $1,000,000.00. Además, alegó que como parte del préstamo Carlos M. Vélez Cruz, su esposa María de los A. Gómez Marcos, así como Agustín Mújica Nazario y su esposa María de los A. González Mulero firmaron garantías continuas, extendidas e ilimitadas. Es decir, adujo que estos se obligaron solidariamente al pago del préstamo otorgado, incluyendo el balance adeudado en caso de incumplimiento con las obligaciones de First Security Mortgage. Añadió que, la línea de crédito se amplió por $250,000.00. Por lo tanto, Caribe Federal presentó la referida demanda con el propósito de cobrar en su totalidad los balances adeudados, como resultado del incumplimiento de First Security Mortgage con los términos y condiciones aplicables relacionados a la línea de crédito.

Por su parte, los Mújica-González presentaron su *Contestación a la Demanda,* en la que argumentaron que Caribe Federal los liberó de su garantía al momento en que el Sr. Mújica dejó de ser accionista de First Security Mortgage, desde el mes de septiembre del año 2016, hace ya más de seis (6) años y medio.[2]

---

[1] Entrada #1 del Sistema Unificado de Manejo y Administración de Casos del Tribunal de Primera Instancia (SUMAC TPI).
[2] Entrada #38 de SUMAC TPI.

Además, indicaron que todos los hechos alegados en la demanda ocurrieron en el año 2019 cuando el Sr. Mújica llevaba casi tres (3) años sin conocimiento o control de los asuntos corporativos de dicha entidad. Igualmente, estos alegaron que el contrato original incluido con la demanda, el cual data del año 2013, vencía todos los años pues su término de vigencia era de un año. De manera que, todos los años Caribe Federal suscribía documentos de renovación y solicitaba estados financieros a los accionistas de First Security Mortgage.

Luego de varios trámites procesales, Caribe Federal presentó una *Solicitud de Sentencia Sumaria*.[3] Allí, anejó la línea de crédito por la cantidad de $1,000,000.00, un acuerdo de garantía sobre línea de crédito y los acuerdos de garantías ilimitadas. En específico, dispuso que los siguientes hechos no están en controversia:

1. El 15 de febrero de 2013, CFCU otorgó a FSMI, una línea de crédito ("Revolving Note") por la suma de $1,000,000.00 (en adelante, la "Línea de Crédito"), con intereses pactados sobre el balance del principal pendiente de saldo a razón del 2% sobre la tasa de interés públicamente anunciada de tiempo en tiempo por el Wall Street Journal el cual nunca excederá el 5.25%, con renovación anual a discreción de CFCU, con demás términos y condiciones. Dicho documento fue firmado por Carlos Manuel Vélez Cruz en representación de First Security Mortgage, Inc. el 15 de febrero de 2013 y notarizado con el número de afidávit 7925 ante la Notario Público Ana T. Ruiz Comas. Véase, Anejo I, REVOLVING NOTE por la cantidad de $1,000,000.00, según descrito anteriormente.

2. El referido "Revolving Note" indica lo siguiente en su párrafo 5to. y citamos:

   **"This Revolving Note has been issued pursuant to, and is entitled to the terms, conditions, benefits and security provided for by, a certain Warehousing Loan and Security Agreement dated February 15, 2013, between Caribe Federal Credit Union and First Security Mortgage, Inc., together with all documents executed thereunder or in connection therewith, being referred to herein as the "Agreement". The Agreement, among other things, contains provisions for prepayments on**

---

[3] Entrada #58 de SUMAC TPI.

**account of principal of Advances under the Revolving Loan made hereunder upon the terms and conditions therein specified."**

3. El préstamo quedó evidenciado, entre otros, por la emisión de un pagaré rotativo ("Revolving Note"), al cual hemos hecho referencia, por la suma de $1,000,000.00, con un acuerdo de garantía sobre Línea de Crédito ("Warehousing Loan and Security Agreement", de ahora en adelante "WLSA"). El WLSA fue firmado por Carlos Manuel Vélez Cruz en calidad de Presidente de FSMI y por José Eurípides Febres Maeso en representación de CFCU, como "Authorized Officer". El WLSA fue debidamente notarizado el 15 de febrero de 2013 con el número de afidávit 7924 ante la Notario Público Ana T. Ruiz Comas. Véase, Anejo II, Warehousing Loan and Security Agreement firmado el 15 de febrero de 2013, según descrito anteriormente.

4. En la sección 17, a la página 28 y 29, del WLSA se establece los términos y condiciones de la Colateral en garantía solidaria al pago del préstamo otorgado a FSMI al cual hemos hecho referencia anteriormente:

> **"SECTION 17. Collateral. To secure the full payment of the Advances, interests thereon, all costs, and to further secure the compliance by the Borrower with each of the obligations and expenses as provided herein, the Borrower shall deliver a Guaranty Agreement executed by Mr. Carlos Manuel Vélez Cruz and his wife, Mrs. María de los Angeles Gómez Marcos and by Agustín Mújica Nazario, and his wife, Mrs. María de los Angeles González Mulero, pursuant to which they guarantee, jointly and severally ("solidariamente") Borrower in the payment and performance of the obligations under this Agreement."** Véase Anejo II, Warehousing Loan and Security Agreement, páginas 28 y 29.

5. En cumplimiento con la obligación anteriormente descrita y como condición al préstamo principal a FSMI, Don Carlos Manuel Vélez Cruz, su esposa María de los Ángeles Gómez Marcos y la Sociedad Legal de Bienes Gananciales compuesta por ambos, otorgaron el 15 de febrero de 2013 una carta de garantía continua, extendida e ilimitada ("Unlimited Guaranty Agreement") y se obligaron solidariamente al pago del préstamo otorgado, incluyendo el balance adeudado en caso de incumplimiento con cualesquiera de las obligaciones por parte de First Security Mortgage, Inc. a base del contrato principal, los accesorios y subsidiarios otorgados como garantía solidaria al mismo. Véase, Anejo III, "Unlimited Guaranty Agreement" (en adelante "UGA"), otorgado por los demandados Carlos Manuel Vélez Cruz, su esposa María de los Angeles Gómez Marcos, por sí y en representación de la Sociedad Legal de Bienes Gananciales compuesta por ambos. El documento fue

otorgado el 15 de febrero de 2013 y notarizado por la Notario Público Ana T. Ruiz Comas con el número de registro de testimonio #7927.

6. De igual manera, y en cumplimiento, expreso con la sección 17 ("Collateral") del WLSA, al cual hemos hecho referencia anteriormente, los co-demandados Agustín Mújica Nazario, su esposa María de los Angeles González Mulero y la Sociedad Legal del Bienes Gananciales compuesta por ambos, mediante carta de garantía continua, extendida e ilimitada ("Unlimited Guaranty Agreement") se obligaron solidariamente al pago del préstamo otorgado y anteriormente descrito, incluyendo el balance adeudado, en caso de incumplimiento, con cualesquiera de las obligaciones por parte de First Security Mortgage, Inc. a base del contrato principal, los accesorios y subsidiarios otorgados como garantía solidaria al mismo. Véase, Anejo IV, "Unlimited Guaranty Agreement" del 15 de febrero de 2013 (en adelante "UGA"), otorgado por los demandados Agustín Mújica Nazario, su esposa María de los Ángeles González Mulero, por sí y en representación de la Sociedad Legal de Bienes Gananciales compuesta por ambos. El documento fue otorgado el 15 de febrero de 2013 y notarizado por la Notario Público Ana T. Ruiz Comas con el número de registro de testimonio #7926.

7. La Línea de Crédito fue ampliada por la suma de $250,000.00 el 25 de abril de 2019, con intereses pactados sobre el balance del principal pendiente de saldo a razón del 2% sobre la tasa de interés públicamente anunciada de tiempo en tiempo por el Wall Street Journal, el cual nunca excederá el 5.25%, con renovación anual a discreción de CFCU, con demás términos y condiciones. Véase, Anejo V, First Amendment to the Warehousing Loan and Security Agreement (en adelante "FA-WLSA"), y Guarantors Acceptance otorgados el 25 de abril de 2019 ante la Notario Público Ana T. Ruiz Comas con el número de registro de afidávit: 9219 y 9220, respectivamente. El FA-WLSA está firmado por Carlos Manuel Vélez Cruz, en calidad de Presidente de First Security Morgage, Inc., y por José Eurípides Febres Maeso, en calidad de "Authorized Officer" de Caribe Federal Credit Union. El FA-WLSA incluye lo que se conoce como un "Guarantors Acceptance". Esta aceptación está firmada por Carlos Manuel Vélez Cruz y su esposa María de los Angeles Gómez Marcos, debidamente notarizada ante la Notario Público Ana T. Ruiz Comas el 25 de abril de 2019 mediante el registro de testimonio #: 9220.

8. La ampliación quedó evidenciada, entre otros, por la emisión de un pagaré rotativo ("Revolving Note") por la suma de $250,000.00 con una primera enmienda al acuerdo de garantía sobre línea de crédito ("First Amendment to the Warehousing Loan and Security Agreement"). Véase, Anejo V, FA-WLSA, y Anejo VI, Revolving Note, por la cantidad de $250,000.00

vencedero el 31 de mayo de 2019 y otorgado el 25 de abril de 2019 por el demandando Carlos Manuel Vélez Cruz en calidad de Presidente de First Security Mortgage, Inc. ante la Notario Público Ana T. Ruiz Comas mediante el número de registro de afidávit: 9221.

9. Tanto como la línea de crédito otorgada el 15 de febrero de 2013 por la suma de $1,000,000.002 , mediante un pagaré rotativo al respecto, y su posterior modificación y ampliación otorgada el 25 de abril de 2019 para un total de $1,250,000.003, quedaron evidenciadas y garantizadas solidariamente, además por las cartas de garantías continuas, extendidas e ilimitadas ("Unlimited Guaranty Agreement") otorgadas por Carlos Manuel Vélez Cruz, su esposa María de los Angeles Gómez Marcos y la Sociedad Legal de Bienes Gananciales compuesta por ambos y por Agustín Mújica Nazario, su esposa María de los Ángeles González Mulero y la Sociedad Legal de Bienes Gananciales compuesta por ambos.

10. A base de los documentos a los cuales hemos hecho referencia en el inciso anterior, y que se incluyen como anejos en la presente solicitud de Sentencia Sumaria los demandados, Carlos Manuel Vélez Cruz, su esposa María de los Ángeles Gómez Marcos y la Sociedad Legal de Bienes Gananciales compuesta por ambos, y Agustín Mújica Nazario, su esposa María de los Ángeles González Mulero y la Sociedad Legal de Bienes Gananciales compuesta por ambos, en calidad de firmantes y garantizadores, son responsables solidariamente del pago adeudado de la línea de crédito otorgada y descrita anteriormente, que asciende posterior a su modificación y ampliación a la suma de $1,250,000.00. Véase Anejo VII, Declaración Jurada suscrita por la Sra. Sol Myriam Morales Cebollero en calidad de Gerente de Cobro de Caribe Federal Credit Union, párrafos 2, 5 y 6.

11. En virtud de los contratos accesorios y subsidiarios otorgados a la obligación principal antes mencionada, Carlos Manuel Vélez Cruz, su esposa María de los Ángeles Gómez Marcos y la Sociedad Legal de Bienes Gananciales compuesta por ambos, así como Agustín Mújica Nazario, su esposa María de los Ángeles González Mulero y la Sociedad Legal de Bienes Gananciales compuesta por ambos, se obligaron solidariamente y de manera continua, extendida e ilimitada, al pago del préstamo otorgado, incluyendo el balance adeudado, en caso de incumplimiento, por las obligaciones con First Security Mortgage, Inc. Véase Anejo VII, (Declaración Jurada suscrita por la Sra. Sol Myriam Morales Cebollero en calidad de Gerente de Cobro de Caribe Federal Credit Union), párrafos 2 al 6.

12. CFCU insta la presente causa de acción en contra de los demandados FSMI, Carlos Manuel Vélez Cruz, su esposa María de los Ángeles Gómez Marcos y la Sociedad Legal de Bienes Gananciales compuesta por ambos, así como Agustín Mújica Nazario, su esposa María de los Ángeles

González Mulero y la Sociedad Legal de Bienes Gananciales compuesta por ambos, con el propósito de cobrar y ejecutar en su totalidad los balances adeudados, como resultado del incumplimiento de FSMI, con los términos y condiciones aplicables a la línea de crédito otorgada el 15 de febrero de 2013 por la suma de un millón de dólares ($1,000,000.00) y su posterior modificación y ampliación otorgada el 25 de abril de 2019 por la suma de doscientos cincuenta mil dólares ($250,000.00) para un total de un millón doscientos cincuenta mil dólares ($1,250,000.00). Véase Anejo VII (Declaración Jurada suscrita por la Sra. Sol Myriam Morales Cebollero en calidad de Gerente de Cobro de Caribe Federal Credit Union y el balance de cancelación ahí incluido, párrafos 4, 5 y 6) y Anejos I y II ("Revolving Note" por $1,000,000.00 y el "Warehousing Loan and Security Agreement", respectivamente). Véase además Anejos V (FA-WLSA) y Anejo VI, (Revolving Note por la cantidad de $250,000.00).

13. Las garantías continuas, extendidas e ilimitadas de los co-demandados Carlos Manuel Vélez Cruz, su esposa María de los Ángeles Gómez Marcos y la Sociedad Legal de Bienes Gananciales compuesta por ambos, así como Agustín Mújica Nazario, su esposa María de los Ángeles González Mulero y la Sociedad Legal de Bienes Gananciales compuesta por ambos, garantizaron solidariamente la deuda incurrida e incumplida por FSMI. Véase Anejo III ("Unlimited Guaranty Agreement" otorgado por Carlos Manuel Vélez Cruz y su esposa María de los Ángeles Gómez Marcos, por sí y en representación de la Sociedad Legal de Bienes Gananciales compuesta por ambos) y Véase Anejo IV ("Unlimited Guaranty Agreement" otorgado por Agustín Mújica Nazario y su esposa María de los Ángeles González Mulero, por sí y en representación de la Sociedad Legal de Bienes Gananciales compuesta por ambos).

14. Visto el incumplimiento de los demandados, tanto del deudor principal como los solidariamente obligados en virtud de los contratos accesorios y subsidiarios así otorgados, con sus obligaciones de hacer pagos a la Línea de Crédito, éstos adeudan a CFCU, conforme balance de reinstalación calculado al 31 de diciembre de 2023, la suma de $992,115.21 por concepto de principal e intereses, la cual continua en aumento hasta el saldo total; más cualesquiera otros cargos, multas y/o penalidades, y adelantos que se hayan concedido en virtud de los instrumentos y acuerdos otorgados, así como costas, gastos y honorarios de abogados. Se incluye estado de cuenta emitido por CFCU a la fecha antes señalada. Véase Anejo VII (Declaración Jurada suscrita por la Sra. Sol Myriam Morales Cebollero en calidad de Gerente de Cobro de Caribe Federal Credit Union y el balance de cancelación ahí incluido, párrafos 2 al 6).

15. Se establece y aclara que la suma porcentual acordada a favor de la parte demandante CFCU con relación a costas,

gastos y honorarios de abogados se pactó entre las partes de la siguiente manera:

> **"Borrower hereby waives presentment, protest, demand, and notice of nonpayment. Borrower hereby agrees to pay as an additional and liquidated sum equal to 10% of the unpaid balance hereof, without necessity of approval by any court, all costs and expenses, including reasonable attorney's fees and expenses, incurred by the holder of this Revolving Note in the event that the holder hereof shall take recourse to judicial proceedings for the collection of any amount due hereunder and such sum shall become due and payable for immediately upon the filing of any such proceedings."** Véase Anejos I y VI, Revolving Note por las cantidades de $1,000,000.00 y $250,000.00, respectivamente.

16. La deuda aquí reclamada en virtud del incumplimiento señalado está vencida y es perfectamente líquida y exigible. Véase Anejo VII (Declaración Jurada suscrita por la Sra. Sol Myriam Morales Cebollero en calidad de Gerente de Cobro de Caribe Federal Credit Union y el balance de cancelación ahí incluido, párrafos 5 y 6).

17. La deuda aquí reclamada no ha sido satisfecha a pesar de los requerimientos que la parte demandante le ha hecho a la parte demandada, que incluyen, pero no se limitan, a la carta remitida a las partes demandadas informando el incumplimiento, declarando la deuda vencida, líquida y exigible y requiriendo el pago de la suma adeudada. Véase Anejo VIII (Carta de Interpelación Extrajudicial del 18 de abril de 2022).

Por su parte, el 31 de marzo de 2025, los apelantes presentaron su *Oposición a la Sentencia Sumaria del apelado y para que se dicte Sentencia Sumaria a su favor*.[4] En lo particular, dispuso los siguientes hechos:

1. Los hechos que surgen del párrafo 1 no están en controversia.

2. Los hechos que surgen del párrafo 2 no están en controversia.

3. Los hechos que surgen del párrafo 3 no están en controversia, pero es pertinente observar que el "Warehousing Loan and Security Agreement" (Anejo II de la solicitud de sentencia sumaria de CF) no está firmado por ninguno de los Mújica-González, sino únicamente por Carlos Vélez como presidente de FSM.

4. Los hechos que surgen del párrafo 4 no están en controversia.

---

[4] Entrada #79 de SUMAC TPI.

5. Los hechos que surgen del párrafo 5 no están en controversia

6. Los hechos que surgen del párrafo 6 no están en controversia.

7. Los hechos que surgen del párrafo 7 están realmente y de buena fe controvertidos. Nos explicamos. En primer lugar, CF omite un hecho de suma importancia para los Mújica-González y es que en septiembre de 2016 el Sr. Mújica solicitó reunirse con el Sr. José Eurípides Febres Maeso, "Authorized Officer" de CF quien había comparecido en todos los documentos contractuales del 2013 entre CF y FSM en representación de CF, y le comunicó que habría de vender sus acciones en FSM a Carlos Vélez y que a partir de octubre de 2016 no tendría relación alguna con FSM [Anejo 1 – Declaración Jurada de Agustín Mújica Nazario, página 5, párrafos 49 a 50]. Conforme el testimonio juramentado del Sr. Mújica, el Sr. Febres le respondió que en ese caso habría que pedirle más colateral a Carlos Vélez. [Anejo 1 – Declaración Jurada de Agustín Mújica Nazario, página 5, párrafos 49 a 50]. La evidencia más elocuente en cuanto a que CF en efecto reconocía que los Mújica-González ya no eran garantizadores del préstamo original de $1,000,000.00, está en los documentos posteriores al 2016, titulados "Proposal Commercial Credit Risk" y que son de suma importancia por un documento preparado por el propio CF y que se le presenta al comité de la institución bancaria que aprueba la renovación anual que CF hacía de la facilidad crediticia. Estos documentos claramente establecen como únicos garantizadores a Carlos Vélez y su esposa precisamente a partir del 2017, luego de la conversación telefónica entre el Sr. Agustín Mújica y el Sr. José E. Febres. [Anejo 2] – Contraste páginas 5, 11, "Warranties Provided" número 4, con página 18, misma sección y número, páginas 24 y 31. En la página 29 también se listan como únicos garantizadores a Carlos Vélez y su esposa. El documento tiene fecha del 29 de mayo de 2019 y claramente se refiere al contrato original de $1,000,000.00. [A esa fecha ya los Mújica-González no eran garantizadores según surge de los propios documentos de CF] Es preciso aquí establecer también que anualmente desde el 2013, CF le solicitaba a ambos, Carlos Vélez y Agustín Mújica, sus estados financieros y les tomaba sus firmas para aprobar la extensión del término original del préstamo por un año adicional. [Anejo 1 – Declaración Jurada de Agustín Mújica Nazario, página 5, párrafos 49 a 50] NADA DE ESO SUCEDIÓ EN CUANTO A LOS MÚJICA-GONZÁLEZ posterior a octubre de 2016. Por lo tanto, para 2019 ha quedado demostrado que los Mújica-González NO ERAN garantizadores del préstamo original de $1,000,000.00. Mucho menos entonces, como se verá, eran garantizadores del segundo contrato producto de una novación por la cantidad de $1,250,000.00. Por lo tanto, y en segundo lugar, lo que CF caracteriza como una ampliación en el párrafo 7 de su solicitud, es realmente una novación que impactó directamente la obligación principal, es decir, la cuantía del préstamo mismo cambiándola a $1,250,000.00. CF omite explicarle a este Honorable Tribunal las razones que obedecieron a tal novación. La principal es que CF no tenía controles, protocolos ni políticas de manejo de la facilidad crediticia lo cual provocó que en el 2019 se hubiera prestado más dinero del millón de dólares originalmente pactado. Esto provocó que CF tuviera que

buscar una forma de justificar el sobregiro y para ello fue necesario novar el contrato original y modificar la cantidad del principal para aumentarla a $1,250,000.00. De modo que ya el aumento y la novación respondían a la propia negligencia de CF en el manejo de su facilidad crediticia. También CF omite que, en el 2019, FSM ya no estaba licenciada para continuar originando préstamos hipotecarios [Anejo 4 – Nationwide Multistate Licensing System Consumer Access page for First Security Mortgage, Inc. que demuestra que desde el 1/1/2018 FSM no estaba autorizada a realizar negocios] por lo que CF estaba prestándole dinero a una entidad que no estaba autorizada en ley a utilizar ese dinero para originar los préstamos que CF sabía que se estaban originando. [Anejo 1 – Declaración Jurada de Agustín Mújica Nazario, página 5, párrafo 30] Más importante aún, CF novó el negocio jurídico con FSM y cuando lo hizo varió la obligación principal del contrato anterior aumentando la cantidad de la facilidad crediticia SIN EL CONSENTIMIENTO O CONOCIMIENTO de los Mújica-González. Prueba de que CF sabía que tenía que obtener tal consentimiento si pretendía descansar en la garantía es que en efecto lo hizo en cuanto al codemandado Carlos M. Vélez y su esposa a quienes se les requirió un documento titulado "Guarantors Acceptance" que NO FUE SUSCRITO por los Mújica-González, pero sí por Carlos Vélez y su esposa y del cual surge claramente que eran los únicos garantizadores ("being the Guarantors of the Warehousing Loan and Security Agreement...") y que expresamente consentían a ratificar la garantía que habían otorgado en el 2013, a lo cual se hace referencia específicamente en el documento. NADA DE ESTO, REPETIMOS, NADA DE ESTO, obtuvo CF de parte de los Mújica-González de lo cual se infiere sin lugar a duda que CF sabía que en ese momento (25 de abril de 2019) los Mújica-González NO ERAN garantizadores de la facilidad y que para que lo fueran, tenían que haber suscrito un documento igual al que suscribieron Carlos Vélez y su esposa. CF no puede ir en contra de sus propios actos. Además, es de suma importancia establecer que FSM incumplía su propio contrato por lo menos en más de 30 cláusulas o disposiciones. Vea los párrafos 5 al 47 [Declaración Jurada de Agustín Mújica Nazario - Anejo 1 de esta oposición]. Se detallan muy específicamente todas las instancias en que FSM no cumplía con las disposiciones del contrato lo cual evidentemente constituyen modificaciones o enmiendas que nunca constaron por escrito. FSM no puede, en contra de sus propios actos, ahora exigir el cumplimiento al pie de la letra con requisitos del contrato que el mismo FSM no respetaba en por lo menos más de 30 disposiciones.

8. Los hechos que surgen del párrafo 8 están de buena fe controvertidos por lo argumentado y demostrado en el párrafo anterior, lo cual se adopta aquí íntegramente por referencia y para evitar tener que repetirlo.

9. Los hechos que surgen del párrafo 9 están de buena fe controvertidos por lo argumentado y demostrado en el párrafo 7, lo cual se adopta aquí íntegramente por referencia y para evitar tener que repetirlo. Específicamente ha quedado demostrado que los Mújica-González no ratificaron ni de ninguna manera consintieron a garantizar el contrato novado. De hecho, ya desde finales del 2016, habían sido liberados como garantizadores del contrato original por $1,000,000.00.

[Vea las fuentes de prueba referenciadas en el párrafo 7, supra].

10. Los hechos que surgen del párrafo 10 están de buena fe controvertidos por lo argumentado y demostrado en el párrafo 7, lo cual se adopta aquí íntegramente por referencia y para evitar tener que repetirlo. Específicamente ha quedado demostrado que los Mújica-González no ratificaron ni de ninguna manera consintieron a garantizar el contrato novado. De hecho, ya desde finales del 2016 habían sido liberados como garantizadores del contrato original por $1,000,000.00. [Vea las fuentes de prueba referenciadas en el párrafo 7, supra].

11. Los hechos que surgen del párrafo 11 están de buena fe controvertidos por lo argumentado y demostrado en el párrafo 7, lo cual se adopta aquí íntegramente por referencia y para evitar tener que repetirlo. Específicamente ha quedado demostrado que los Mújica-González no ratificaron ni de ninguna manera consintieron a garantizar el contrato novado. De hecho, ya desde finales del 2016 habían sido liberados como garantizadores del contrato original por $1,000,000.00. [Vea las fuentes de prueba referenciadas en el párrafo 7, supra]

12. Los hechos que surgen del párrafo 12 están de buena fe controvertidos por lo argumentado y demostrado en el párrafo 7, lo cual se adopta aquí íntegramente por referencia y para evitar tener que repetirlo. Específicamente ha quedado demostrado que los Mújica-González no ratificaron ni de ninguna manera consintieron a garantizar el contrato novado. De hecho, ya desde finales del 2016 habían sido liberados como garantizadores del contrato original por $1,000,000.00. [Vea las fuentes de prueba referenciadas en el párrafo 7, supra].

13. Los hechos que surgen del párrafo 13 están de buena fe controvertidos por lo argumentado y demostrado en el párrafo 7, lo cual se adopta aquí íntegramente por referencia y para evitar tener que repetirlo. Específicamente ha quedado demostrado que los Mújica-González no ratificaron ni de ninguna manera consintieron a garantizar el contrato novado. De hecho, ya desde finales del 2016 habían sido liberados como garantizadores del contrato original por $1,000,000.00. [Vea las fuentes de prueba referenciadas en el párrafo 7, supra].

14. Los hechos que surgen del párrafo 14 están de buena fe controvertidos por lo argumentado y demostrado en el párrafo 7, lo cual se adopta aquí íntegramente por referencia y para evitar tener que repetirlo. Específicamente ha quedado demostrado que los Mújica-González no ratificaron ni de ninguna manera consintieron a garantizar el contrato novado. De hecho, ya desde finales del 2016 habían sido liberados como garantizadores del contrato original por $1,000,000.00. [Vea las fuentes de prueba referenciadas en el párrafo 7, supra]. Adicionalmente se hace referencia aquí a que se solicitaron como parte del descubrimiento de prueba limitado por el Tribunal, para efectos de fundamentar la presente oposición, los siguientes documentos que CF ha

declarado bajo certificación jurada [Vea SUMAC #78] que no existen:

a. Criterios utilizados por CF para tomar renovar anualmente la facilidad crediticia original de $1,000,000.00.

b. Documentos que evidencien que CF obtenía los estados financieros de los Mújica-González posterior a octubre de 2016 así como los de Carlos Vélez y su esposa.

c. Protocolos de manejo de la facilidad crediticia, manual de procedimientos relacionados con un "Warehousing Line of Credit".

d. Cartas de cobro cada vez que se incumplía con los términos de la facilidad crediticia o con términos del contrato por parte de FSM.

e. Evidencia de gestiones realizadas por CF para ejecutar los pagarés de cada préstamo desembolsado con dinero del "Warehousing Line of Credit". De hecho, nunca CF realizó gestiones para utilizar la colateral que supuestamente representaba cada pagaré desembolsado.

15. Los hechos que surgen del párrafo 15 están de buena fe controvertidos por lo argumentado y demostrado en el párrafo 7, lo cual se adopta aquí íntegramente por referencia y para evitar tener que repetirlo. Específicamente ha quedado demostrado que los Mújica-González no ratificaron ni de ninguna manera consintieron a garantizar el contrato novado. De hecho, ya desde finales del 2016 habían sido liberados como garantizadores del contrato original por $1,000,000.00. [Vea las fuentes de prueba referenciadas en el párrafo 7, supra].

16. Los hechos que surgen del párrafo 16 están de buena fe controvertidos por lo argumentado y demostrado en el párrafo 7, lo cual se adopta aquí íntegramente por referencia y para evitar tener que repetirlo. Específicamente ha quedado demostrado que los Mújica-González no ratificaron ni de ninguna manera consintieron a garantizar el contrato novado. De hecho, ya desde finales del 2016 habían sido liberados como garantizadores del contrato original por $1,000,000.00. [Vea las fuentes de prueba referenciadas en el párrafo 7, supra].

17. Los hechos que surgen del párrafo 17 están de buena fe controvertidos por lo argumentado y demostrado en el párrafo 7, lo cual se adopta aquí íntegramente por referencia y para evitar tener que repetirlo. Específicamente ha quedado demostrado que los Mújica-González no ratificaron ni de ninguna manera consintieron a garantizar el contrato novado. De hecho, ya desde finales del 2016 habían sido liberados como garantizadores del contrato original por $1,000,000.00. [Vea las fuentes de prueba referenciadas en el párrafo 7, supra].[5]

---

[5] Entrada #79 de SUMAC TPI.

La parte apelante adujo que la apelada lo relevó del cumplimiento de la obligación solidaria y que la evidencia documental presentada por la propia Caribe Federal lo confirmaba.

Así las cosas, Caribe Federal se opuso a la solicitud de sentencia sumaria y presentó su réplica a la oposición a la sumaria.[6] En cuanto a la réplica, alegó que Mújica-González no cumplió con los requisitos de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, dado a que no citaron los párrafos, no presentaron evidencia admisible y no controvirtieron la prueba presentada por el apelado. Además, alegó que la prueba unida a la solicitud de sentencia sumaria parcial de Mújica-González no cumple con los requisitos y/o con el valor probatorio. Por último, sostuvo que no hay controversia real sobre los hechos materiales en este caso.

Analizadas ambas posiciones, el TPI declaró "Ha Lugar" la solicitud de sentencia sumaria de Caribe Federal, sin hacer determinaciones de hecho, conforme a Pérez Vargas v Office Depot 203 DPR 687 (2019). Según el foro apelado las partes acordaron expresamente (1) que el contrato de préstamo podía modificarse, sin que la garantía perdiera validez y que (2) el garantizador únicamente podía ser relevado de la obligación por escrito. El TPI dictó sentencia sumaria a favor de la apelada, porque no existía evidencia de una notificación escrita de Caribe Federal liberando a la parte apelante del cumplimiento de la garantía solidaria. Por eso resolvió, que todos los demandados eran deudores solidarios frente a Caribe Federal, incluyendo a los apelantes. Por último, advirtió que los codemandados Carlos Manuel Vélez Cruz, María de los Ángeles Gómez Marcos y First Security Mortgage Inc., se allanaron a la solicitud de Caribe Federal, porque no se opusieron.

---

[6] Entrada #83 de SUMAC TPI.

El TPI ordenó a Carlos Manuel Vélez Cruz, María de los Ángeles Gómez Marcos, Agustín Mujica Nazario, María de los Ángeles González Mulero y a First Security Mortgage, Inc., a pagar de forma solidaria a Caribe Federal la cantidad de $992,115.21 por razón de principal de intereses hasta el 31 de diciembre de 2022. Según el TPI la deuda continuará en aumento hasta su saldo a razón de 2% sobre la tasa de interés anunciada por WSJ que nunca excederá 5.25%. Asimismo, ordenó el pago de honorarios según pactados por $92,211.52.

Inconforme con el proceder del foro primario, el 4 de octubre de 2025, los apelantes acudieron ante este Tribunal mediante recurso de *Apelación* y señalan el siguiente error:

> ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DICTAR UNA SENTENCIA SUMARIA A FAVOR DE LOS APELADOS Y RECHAZAR DICTAR LA SENTENCIA SUMARIA PARCIAL A FAVOR DE LOS APELANTES CUANDO EL DERECHO LE ASISTE A LOS APELANTES Y CUANDO, EN LA ALTERNATIVA, EXISTE CONTROVERSIA SOBRE HECHOS MEDULARES QUE IMPIDEN QUE SE DICTE LA SENTENCIA SUMARIA A FAVOR DE LOS APELADOS.

**II.**

**A. Moción de Sentencia Sumaria**

Nuestro ordenamiento procesal civil reconoce el uso y valor que tiene la sentencia sumaria para asegurar una solución justa, rápida y económica de los casos. *CSM v. ELA,* 2025 TSPR 78, 5 (2025). La herramienta procesal de la sentencia sumaria posibilita la pronta resolución de una controversia, cuando no es necesario celebrar un juicio en su fondo. No obstante, para que proceda es necesario que, de los documentos no controvertidos surja que no hay controversia real y sustancial sobre los hechos materiales del caso. Un hecho material es aquel que puede afectar el resultado de la reclamación, de acuerdo con el derecho sustantivo aplicable. Cualquier duda es insuficiente para derrotar una moción de sentencia sumaria. Por lo tanto, esta procede cuando no existe

controversia de hechos materiales y únicamente resta aplicar el derecho. *Cruz, López v. Casa Bella y otros,* 213 DPR 980, 993 (2024); *Universal Ins. y otro v. ELA y otros,* 211 DPR 455, 471-472 (2023).

La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, permite que se dicte sentencia sumaria contra una parte sin necesidad de juicio sujeto al cumplimiento de ciertos requisitos. Al respecto, la parte contra quien se haya formulado una reclamación podrá presentar una moción de sentencia sumaria, no más tarde de los treinta (30) días siguientes a la fecha límite establecida por el tribunal para concluir el descubrimiento de prueba, según lo dispuesto en la Regla 36.2 de Procedimiento Civil, *supra.*

Por su parte, la Regla 36.3 de Procedimiento Civil, *supra,* contiene los requisitos de forma para instar una moción de sentencia sumaria y su respectiva oposición. La parte que sostenga la inexistencia de una controversia sustancial de hechos esenciales y pertinentes debe presentar una moción que se funde en declaraciones juradas u otra evidencia admisible. Además, tanto la moción como la oposición deberán cumplir con lo establecido en la Regla 36.3 de Procedimiento Civil, *supra.* Ahora bien, el juzgador no puede dictar sentencia sumaria cuando: (1) existen hechos esenciales controvertidos, (2) la demanda tiene alegaciones afirmativas que no han sido refutadas, (3) existe una controversia real sobre algún hecho esencial o material que surge de los propios documentos que acompañan la moción o (4) no procede como cuestión de derecho. *CSM v. ELA, supra,* pág. 6; *Universal Ins. y otro v. ELA y otros, supra,* pág. 472.

Las declaraciones juradas en apoyo u oposición a la moción de sentencia sumaria (1) tienen que estar basadas en el conocimiento personal del declarante, (2) contener hechos admisibles en evidencia y (3) el declarante tiene que estar cualificado

para declarar sobre su contenido. Regla 36.5 de Procedimiento Civil, *supra*. No obstante, las declaraciones juradas con solo conclusiones reiteradas de las alegaciones de la demanda y que no contienen hechos específicos que las apoyen, carecen de valor probatorio y son insuficientes para demostrar la existencia de sus conclusiones. Ramos Pérez v Univisión, 178 DPT 200, 216 (2010).

En cuanto a la revisión de la acogida o no de una solicitud de sentencia sumaria el Tribunal de Apelaciones se encuentra en la misma posición que el foro primario, al momento de revisar las solicitudes. *CSM v. ELA, supra*, pág. 6. Al igual que el TPI tiene que regirse por la Regla 36 de Procedimiento Civil, *supra*, y aplicar los criterios que esa regla y su jurisprudencia interpretativa exigen. Ambos foros tienen que revisar que la moción de sentencia sumaria y su oposición cumplan los requisitos de forma, codificados en la Regla 36 de Procedimiento Civil, *supra.*

Ahora bien, en el análisis del foro revisor no se podrá considerar evidencia que las partes no presentaron en el TPI. Este foro tampoco podrá adjudicar los hechos materiales en controversia, porque esa es una tarea que le corresponde al foro primario. Es decir, la revisión del Tribunal de Apelaciones es un juicio de *novo.* El foro apelativo debe examinar el expediente de la manera más favorable para la parte opositora a la moción de sentencia sumaria y hacer todas las inferencias permisibles a su favor. *Cruz, López v. Casa Bella y otros, supra*; *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 118 (2015).

En resumen, al revisar una sentencia sumaria, el Tribunal de Apelaciones tiene que evaluar si realmente existen hechos materiales en controversia. Cuando se determina que existen hechos materiales en controversia se debe exponer cuáles son. Además, tiene que determinar cuáles están incontrovertidos. Si encuentra que todos los hechos materiales están realmente

incontrovertidos, procede que revise de *novo*, si el TPI aplicó correctamente el Derecho. *Meléndez González et al. v. M. Cuebas, supra*, pág. 119.

### B. Doctrina General de los Contratos

En Puerto Rico rige el principio de la libertad en la contratación mediante el cual los contratantes pueden establecer los pactos, las cláusulas y las condiciones que tengan por conveniente, siempre que no sean contrarias a las leyes, a la moral ni al orden público. Artículo 1207 del Código Civil, 31 LPRA sec. 3372.[7] A partir del perfeccionamiento de un contrato, las partes quedan obligadas al cumplimiento de lo pactado expresamente y a las consecuencias que se derivan de este, conforme a la buena fe, al uso y a la ley. Artículo 1210 del Código Civil, 31 LPRA sec. 3375. Nuestro ordenamiento concede una amplia libertad de acción a las partes que desean obligarse. *Cruz, López v. Casa Bella y otros, supra,* pág. 995; *VDE Corporation v. F & R Contractors*, 180 DPR 21, 33 (2010); *De Jesús González v. A.C.*, 148 DPR 255, 263 (1999).

Si los términos del contrato son claros y no dejan duda sobre la intención de las partes, se estará al sentido literal de sus palabras. Art. 1233 del Código Civil, 31 LPRA sec. 3471. Ahora bien, si de la lectura literal no es posible determinar la voluntad de las partes, es necesario juzgar la intención de estos a la luz de los actos anteriores, coetáneos y posteriores al contrato. *Cruz, López v. Casa Bella y otros, supra,* págs. 995-996; *Negrón Vélez v. ACT*, 196 DPR 489, 506–507 (2016); *S.L.G. Irizarry v. S.L.G. García*, 155 DPR 713, 726 (2001).

---

[7] El ordenamiento jurídico vigente a los hechos del caso es el Código Civil de 1930 (derogado), 31 LPRA ant. sec. 1 *et seq.*

### C. Solidaridad en los contratos

En nuestro ordenamiento jurídico operan las obligaciones mancomunadas y solidarias. En cuanto a la mancomunada, cada deudor cumple con su parte de la deuda de manera independiente, mientras que, en una obligación solidaria, cada deudor tiene el deber de satisfacer la totalidad del crédito que posee el acreedor. *Otero Rivera v. USAA Fed. Savs. Bank*, 214 DPR 473, 492 (2024); *Fraguada Bonilla v. Hosp. Aux. Mutuo*, 186 DPR 365, 375 (2012). Ahora bien, es principio reconocido que las obligaciones solidarias no se presumen.

En *Fraguada Bonilla v. Hosp. Aux. Mutuo*, *supra*, pág. 377, nuestro Tribunal Supremo hizo una distinción entre la solidaridad propia o perfecta y la solidaridad impropia o imperfecta. La solidaridad propia o perfecta es aquella que fue pactada o de vínculo preexistente; la solidaridad impropia o imperfecta es la que surge cuando son varios los responsables de un daño extracontractual. Íd. Conviene señalar, que la solidaridad propia o perfecta constituye una excepción en el régimen contractual, por lo que la obligación no podrá ser considerada de esa forma, a menos que surja expresamente. *Gen. Accid. Ins. Co. P.R. v. Ramos*, 148 DPR 523, 537 (1999).

Por otra parte, la característica principal de la solidaridad es que cada cocausante tiene la obligación de responder frente al perjudicado por la totalidad de sus daños. *Maldonado Rivera v. Suárez y otros*, 195 DPR 182, 204 (2016). No obstante, el perjudicado podrá recobrar de cada cocausante demandado la totalidad de la deuda que proceda, porque los efectos primarios de la solidaridad se mantienen. *Fraguada Bonilla v. Hosp. Aux. Mutuo, supra,* pág. 389. Esta relación entre los cocausantes se conoce como relación interna y en ésta podría tener lugar la acción

de nivelación. *Rodríguez et al. v. Hospital et al.,* 186 DPR 889, 901 (2012).

De manera que, cuando alguno de los cocausantes paga la totalidad de la condena impuesta, los demás cocausantes quedan liberados de la obligación ante el perjudicado. *Maldonado Rivera v. Suárez y otros, supra,* pág. 204. Dicho de otra forma, bajo nociones de equidad, nuestro más alto foro local ha reconocido que el cocausante que indemniza al perjudicado en una proporción mayor a su grado de culpa en el daño, puede reclamar a los otros el reembolso correspondiente según sus respectivos porcientos de responsabilidad. Íd.

### D. Doctrina de actos propios

La doctrina de actos propios tiene como propósito en nuestro ordenamiento jurídico el proteger la confianza depositada en los actos, el interés social y la consecución de un ideal de justicia. *Carmona, Negrón v. BSN y otros,* 214 DPR 388, 399 (2024); *Alonso Piñero v. UNDARE, Inc.,* 199 DPR 32 (2017); *Int. General Electric v. Concrete Builders,* 104 DPR 871 (1976). Esta norma, se encuentra fundamentada en la buena fe, el desenvolvimiento de las relaciones jurídicas, el ejercicio de los derechos y el cumplimiento de las obligaciones. *Vivoni Farage v. Ortiz Carro,* 179 DPR 990, 1010 (2010).

Esta doctrina busca penalizar la conducta contradictoria, ya que esta es una contravención e infracción del principio de la buena fe. Nuestro más alto foro local ha reconocido que esa conducta no tiene lugar en nuestro ordenamiento, por lo que, debe ser impedida a toda costa. *Int. General Electric v. Concrete Builders, supra,* pág. 877. Es decir, la doctrina de actos propios impide que una persona asuma una conducta contradictoria a una actuación previa que generó expectativas en quien confió en su obrar. *Domenech v. Integration Corp. et al.,* 187 DPR 595, 621 (2013); *Santiago et al. v.*

*Rodríguez et al.,* 181 DPR 204, 217 (2011); Ahora bien, la aplicación de la doctrina de actos propios está sujeta a que concurran los siguientes factores:

> (a) Una conducta determinada de un sujeto, (b) que haya engendrado una situación contraria a la realidad, esto es, aparente y, mediante tal apariencia, susceptible de influir en la conducta de los demás, y (c) que sea base de la confianza de otra parte que haya procedido de buena fe y que, por ello, haya obrado de una manera que le causaría un perjuicio si su confianza quedara defraudada. *Carmona, Negrón v. BSN y otros,* pág. 399; *Vivoni Farage v. Ortiz Carro,* supra, págs. 1010–1011.

Como norma general, la doctrina de actos propios no aplica a las relaciones de partes privadas frente al Gobierno. *Rivera et al. v. Torres et al.,* 214 DPR 111, 280 (2024). No obstante, "en situaciones en las que no se afecte el interés público y en las que pueda ocurrir una clara injusticia, las doctrinas como la de los actos propios o "equitable estoppel" pueden ser utilizadas contra el Estado". Íd., pág. 281.

### III.

La controversia se reduce a determinar, si procede dictar sentencia sumaria contra el apelante. Su representación legal aduce que existe controversia de hechos esenciales que impidan responsabilizar solidaria y sumariamente al apelante por el pago de la obligación que reclama la apelada. El apelante alega que el representante autorizado de la apelada José E Febres Maeso, lo exoneró del cumplimiento de la obligación el 21 de septiembre de 2016. Según el apelante, ese hecho es confirmado mediante documentos otorgados y suscritos posteriores. Por su parte, la apelada sostiene que ambas partes acordaron que el apelante solo podía ser exonerado de responsabilidad por escrito y conforme a lo pactado.

La representación legal del apelante acompañó su oposición a la moción de sentencia sumaria con una Declaración Jurada

otorgada por el señor Mújica el 31 de marzo de 2025. El apelante declaró textualmente lo siguiente:

48. Que allá para septiembre, 21 de 2016 habló por teléfono con el representante de Caribe Federal José Febres, a quien le indiqué que iba a vender mi participación en FSM al Sr Vélez y le solicité que me dijera que acción procedía de mi parte. Su respuesta fue que en la renovación el Sr Vélez tendría que proveer colateral adicional, liberando mi garantía en ese momento, y no me solicitó ningún documento o acción adicional de mi parte.

49. Este asunto queda validado con los documentos provistos por Caribe Federal durante el descubrimiento de prueba. Cada instancia de renovación de préstamo conlleva un documento delineando las características crediticias financieras, personales y garantías y colaterales provistas para la aprobación del préstamo, Proposal Commercial Credit Risk. Una vez aprobado el préstamo se firma un documento por todas las partes aceptando los términos de la facilidad de crédito. Warehousing Loan and Security Agreement. Como se desprende de estos documentos mi nombre y el de mi esposa estaban incluidos en la sección de Other Participants, mi condición crediticia y financiera estaba incluida en la sección Proposer on Comments, Customer Request Participants and Warranties y la sección llamada Garantías Provistas incluía mis, y mi esposa, garantías personales, durante las renovaciones hasta el 2016.

50. En el 2017, posterior a mi conversación con el Sr. Febres, los documentos de renovación cambian. El Proposal Commercial Credit Risk en la sección Proposer on Comments Customer Request, Participants and Warranties indica por escrito que el único accionista de FSM es Carlos Vélez ya que este servidor salió de la corporación para empezar otro empleo. También elimina todo comentario sobre mi persona y esposa en cuanto a perfil financiero o crediticio, elimina mi nombre y el de mi esposa de la sección Other Participants y releva mis garantías personales por escrito al eliminar mis garantías de la sección llamada Garantías Provistas. También sustenta la liberación de mis garantías y responsabilidades el hecho de que durante la aprobación inicial y renovaciones hasta mi salida en el 2016 se me solicitaba firmar el documento Warehousing Loan and Security Agreement que establecía los nuevos términos, pero una vez que liberaron mi garantía no me presentaron dicho documento, renovación 2017 en adelante.

51. Que luego de mi conversación en septiembre de 2016, con el Sr. Febres, ni Caribe Federal, ni el Sr. Febres se comunicaron con mi persona para informarme de nada relacionado a la línea de crédito o requerirme algún documento relacionado con ninguno de los dos acuerdos de Warehousing (2013 o 2019).

52. Que nunca autoricé a Caribe Federal a verificar mi crédito luego de 2013.

El apelante acompañó su oposición a la sentencia sumaria con la prueba documental siguiente (1) el First Amendment to the Warehousing Loan and Security Agreement otorgado el 25 de abril de 2018, (2) el Guarantore Acceptance de esa misma fecha, (3) el Credit Approval Memorandum del 3 de octubre de 2011, (4) el Warehousing Loan And Security Agreement $1,000.000.00 del 22 de junio de 2016, (5) el Warehousing Loan And Security Agreement $1,000.000.00 del 13 de junio de 2017 y (6) el Warehousing Loan And Security Agreement $1,000.000.00 de 16 de mayo de 2018.

Este tribunal concluye que existe controversia de hechos esenciales que impiden la adjudicación sumaria a favor de la apelada. Nuestra determinación se basa en un juicio de *novo* de la totalidad de la prueba.

El apelante presentó una Declaración Jurada sobre hechos concretos y específicos. Los hechos sobre los que declaró son de su conocimiento personal, porque forman parte de una conversación con el representante de la apelada. Según consta en su declaración jurada el 21 de septiembre de 2016, el apelante consultó al señor Febres cómo podía ser liberado de su responsabilidad solidaria. El representante de la apelada le contestó que el codeudor tenía que proveer un colateral adicional al momento de la renovación y no requirió documento alguno, ni ninguna acción adicional de su parte.

Por último, el apelante declaró que la propia apelada evidenció con prueba documental su liberación del cumplimiento de la obligación. Los documentos a los que se refiere el apelante evidencian que la apelada excluyó su nombre de los documentos de renovación y de las garantías provistas y, no requirió su firma en el Warehousing Loan and Security Agreement, con posterioridad al año 2016 y la conversación con el señor Febres. La prueba

documental a la que alude el apelante confirma su comparecencia y participación en el Warehousing and Security Agreement del año 2016 y su incomparecencia y falta de mención en los Warehousing and Security Agreement del 2017 y 2018 y en el First Amendment to the Wareehousing Loan And Security Agreement del 25 de abril de 2019. Este último documento está firmado únicamente por Carlos Manuel Vélez Cruz y José Febres Euripides Maeso. El Guarantors Acceptance de esa fecha también está firmado por Carlos Manuel Vélez Cruz y María de Los Ángeles Gómez Marcos. No obstante, el apelante no es mencionado ni comparece firmando ese documento.

Este tribunal tiene claro que no existe controversia de que las partes acordaron que la obligación solo podía cancelarse mediante una notificación escrita informando que la garantía fue revocada. Sin embargo, la declaración jurada del apelante y los documentos en apoyo a los hechos sobre los que declaró nos crean dudas sobre asuntos medulares como los siguientes (1) si la apelada consintió a exonerar de responsabilidad al apelante de forma distinta a lo originalmente pactado o le hizo creer que así seria, y (2) si la omisión del nombre del apelante y su incomparecencia en los acuerdos y documentos otorgados posterior al año 2016, confirman que la apelada lo liberó del cumplimiento de la obligación. La falta de certeza sobre estos aspectos medulares nos obliga a concluir que no procede adjudicar sumariamente responsabilidad a la apelante. Por consiguiente, es necesario que las controversias señaladas se adjudiquen en un juicio plenario.

**IV.**

Por los fundamentos antes expuestos, se revoca la Sentencia apelada.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones